STATE of Minnesota, Respondent,

v.

Philander Dermont JENKINS,
Appellant.

No. A08–1269.

Supreme Court of Minnesota.

May 20, 2010.

218

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, MN, for respondent.

Jill Clark, Golden Valley, MN; and Jill M. Waite, Minneapolis, MN, for appellant.

## OPINION

PAGE, Justice.

Appellant Philander Dermont Jenkins was indicted on two counts of first-degree premeditated murder and two counts of first-degree felony murder for the shooting deaths of Lorenzo Porter and Eugene Curry and, after a jury trial, was found guilty on all counts. The district court entered convictions on the two first-degree premeditated murder counts and imposed consecutive sentences of life in prison without the possibility of release. In this direct appeal, Jenkins raises the following issues: (1) whether his arrest pursuant to a Crow Wing County bench warrant was

unlawful and, if so, whether his arrest was otherwise supported by probable cause; (2) whether the district court erred in denying his motion to suppress evidence seized from his person incident to his arrest; (3) whether the district court erred in denying his motion to suppress evidence seized from the room where he lived; (4) whether the district court erred in excluding alternative-perpetrator evidence; (5) whether the district court erred in excluding certain bias evidence; (6) whether Jenkins' right to due process was violated by police; (7) whether his right to due process was violated by prosecutorial misconduct; (8) whether he is entitled to a new trial based on newly discovered evidence; and (9) whether the district court erred in imposing consecutive life sentences. We affirm Jenkins' convictions and sentences.

*Background*

Between 2:00 and 2:30 a.m. on March 14, 2007, Porter and Curry were shot to death in the first-floor unit of a North Minneapolis triplex. The unit, located at 2922 Dupont, was the home of Cassandra Simms, who lived there with her children. Simms, along with three of her children, 12–year–old S.F. and 5–year–old twins J.F. and D.F., and a friend, Patricia Walker, were present in the home during the hours leading up to and at the time of the shootings. Shortly after the shootings, Simms called the police from a neighbor's telephone. Upon their arrival, the police found Porter's body in the kitchen on the floor and Curry's body in a bedroom off the kitchen. There was cocaine, baking powder, plastic bags, and a scale on the kitchen table and a footprint in the blood on the floor next to Porter's body. The pants worn by both Porter and Curry were pulled down with the pockets turned inside out. The police investigation proceeded quickly after their arrival.

Through interviews with Simms and Walker, the police learned that in the late afternoon hours on March 13, 2007, Porter, Curry, and Jenkins visited Simms' home. At the time, Jenkins was wearing a black hooded sweatshirt, black tennis shoes, and blue jeans. Porter, Curry, and Jenkins left the unit around 8 p.m. and at some point later that night Porter and Curry returned to the unit without Jenkins. Around midnight, Simms, who had been in bed sleeping since about 5 p.m., awoke and went to the kitchen to take some medication. Before going back to bed, Simms had a conversation with Jenkins, who by then had returned to Simms' unit. Sometime later, Jackie Mack and Marvin White stopped by and an argument ensued between Mack and Curry. During this argument, Mack threatened that she was going to send someone to shoot Curry. After the argument, Mack and White left.

Around 2:25 a.m., Simms, Walker, and the three children, who were all sleeping, were awakened by the sound of gunshots and gathered in the doorway to the unit's middle bedroom. According to Simms, she saw a taller man, who was wearing a black hooded sweatshirt and black shoes and pants walk toward the front door and leave the unit. Having gotten a glimpse of the man's clothing, Simms identified him as possibly Jenkins. At trial, she additionally testified that she saw the man's face and it was Jenkins. According to Walker, she saw two men leave. One was wearing a black hooded sweatshirt, light jeans, and white shoes, and the other wore a black hooded sweatshirt, dark jeans, and black shoes. Walker recognized Jenkins' voice when one of the men yelled to the other to get going.

The police learned from Porter's brother that Porter had called his brother earlier that evening using a cell phone Porter owned. The cell phone, however, was not

in the holster Porter was wearing and could not be found in the unit. As a result, the police sought and obtained the call log for the phone from Porter's cell phone service provider. The call log indicated that a number of calls were made on the phone after Porter's death. One of those calls was to a taxicab company. From the taxicab company, the police learned that a male and female passenger were picked up at 1714 Broadway in North Minneapolis and taken to the intersection of 18-1/2 Street and Quincy in Northeast Minneapolis.

Around 5:20 a.m. that morning, the police interviewed an occupant of the upstairs unit of the triplex at 2922 Dupont who indicated that a person the occupant knew as "Kill" or "Phil" had been shot a couple of days earlier and that "Phil" had recently tried to sell a gun to the occupant's brother. Viewing a photo of Jenkins, the occupant identified Jenkins as the person she knew as "Phil."

At some point that morning the police learned that Jenkins lived in a rooming house at 1811 Quincy in Northeast Minneapolis. They also learned that there was an outstanding Crow Wing County bench warrant for Jenkins' arrest. Based on all the information they had obtained, the police began the application process for a warrant to search 1811 Quincy and dispatched the Violent Criminal Apprehension Team to that address. Upon their arrival, several officers approached the front door of 1811 Quincy and knocked. After several minutes, Jenkins answered the door, but lied about his identity. After determining that the man who answered the door was Jenkins, the officers placed him under arrest.

According to the arresting officers, once arrested, Jenkins, accompanied by officers, was allowed to retrieve shoes and a coat from his room. Before entering the room,

Jenkins indicated that an unclothed woman was in the room. A female officer entered the room to verify that there was a woman inside and to allow her to get dressed. While in the room, the officer noticed two cell phones in plain view on a dresser. Information about the cell phones was forwarded to the officers applying for the search warrant. Once the woman, later identified as Lillian Blount, was clothed, the officer escorted her from the room and Jenkins briefly entered the room to retrieve his shoes and coat. Both Jenkins and Blount were then transported to the police department for questioning. When Jenkins arrived at the homicide unit, the police observed what appeared to be blood on Jenkins' clothing. As a result, the clothing was photographed and subsequently seized.

After Jenkins and Blount were taken to the homicide unit, several officers remained at the rooming house to "freeze" the scene to ensure that no one went in or came out of Jenkins' room before the search warrant could be procured. Two officers remained inside the room for about ten minutes after Jenkins was removed. One of those officers saw what appeared to be the barrel of a handgun sticking out from under clothing near a chair in the room and that information was forwarded to the officers seeking the warrant. A warrant was subsequently issued, the room was searched, and a number of items were seized, including the two cell phones and the gun seen earlier by the officers.

Jenkins' version of his arrest was markedly different. At the suppression hearing, Jenkins testified that he never asked to retrieve any clothing from his room because he was wearing his coat and shoes at the time of his arrest. He further testified that, upon arrest, he was immedi-

ately escorted outside to a police vehicle and never returned to his room.

## I.

First, Jenkins argues that his arrest pursuant to the Crow Wing County bench warrant was unlawful because the warrant was used as a pretext for probable cause to arrest him for the murders of Porter and Curry. He further contends the police did not otherwise have probable cause to arrest him for those murders. He suggests that the warrant was being used by the Minneapolis police in an effort to frame him for the murders because of a lawsuit he had successfully brought against them. Thus, he argues that the evidence seized pursuant to his arrest should have been suppressed.

■ The Fourth Amendment provides that

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Minnesota Constitution, using nearly identical language, also protects a person's right to be free from unreasonable searches and seizures. Minn. Const. art. I, § 10. However, for an arrest without a warrant, "this court independently reviews the facts to determine the reasonableness of the conduct of police" in making the arrest. *State v. Riley*, 568 N.W.2d 518, 523 (Minn.1997). "The question of the legality of the arrest turns not on the reasonableness or practicality of obtaining a warrant, but on the reasonableness of the arrest." *Id.* Probable cause for an arrest exists when the police "reasonably could have believed that a crime has been committed by the person to be arrested." *Id.* (citation omitted) (internal quotation marks omitted). The reasonableness of the actions of the police is an objective inquiry based on the collective knowledge of the officers. *Id.* "The existence of probable cause depends on the facts of each individual case." *Id.* (citation omitted) (internal quotation marks omitted).

■ With respect to Jenkins' claim that the police misused the bench warrant to arrest him for the two murders, we first note that there can be no question that an arrest pursuant to a valid warrant is supported by probable cause and is therefore reasonable. Jenkins has not identified, and we have not found, any case in which we have held otherwise. Nor are we aware of any case in which we have looked beyond the validity of the warrant and examined law enforcement's motive for executing the warrant, and we decline to do so in this case. Jenkins did not challenge the validity of the Crow Wing County bench warrant at the trial court, nor has he done so here. Further, the record before us does not contain anything that calls into question the validity of the bench warrant. Thus, we conclude that Jenkins' arrest pursuant to that warrant was proper.

■ Independent of the Crow Wing County bench warrant, we are satisfied, based on the record before us, that the police had probable cause to arrest Jenkins for the murders of Porter and Curry. The objective evidence supporting probable cause to arrest Jenkins for the murders and available to police at the time of the arrest includes the following: a statement from a witness indicating that just days before the murders Jenkins was in possession of a gun; Jenkins spent much of the late afternoon and early evening

before the murders with the two victims at the location where they were killed; Jenkins was seen at the location where the murders occurred; an occupant of the triplex unit where the murders took place informed police officers that she saw a man wearing clothing similar to those worn by Jenkins that evening leaving the scene shortly after the murders took place; and that occupant affirmed that Jenkins could have been the person she saw leaving the scene shortly after the murders.

The police also knew that the cell phone of one of the victims could not be found at the crime scene; that the missing cell phone was used sometime after the murders to call a taxicab operator, who dispatched a taxicab to 1714 Broadway in North Minneapolis; and that the taxicab picked up a man and a woman from that address and dropped them off at 18–1/2 Street and Quincy in Northeast Minneapolis. The police were aware that Jenkins lived at 1811 Quincy in Northeast Minneapolis, which was close to the location where the taxicab dropped off the man and the woman. Finally, when the police arrived at 1811 Quincy and confronted Jenkins, he lied to them about his identity. Based on this evidence, we conclude that the information available to the police at the time of Jenkins' arrest supports probable cause for that arrest.

## II.

■ Jenkins also argues that his clothing was unlawfully seized incident to his arrest. This argument also fails. During a lawful custodial arrest, the police are authorized to perform a full search of the person without a warrant. *United States v. Robinson,* 414 U.S. 218, 225, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). "[T]he effects in [the arrestee's] possession at the place of detention that were subject to search at the time and place of his arrest may law-

fully be searched and seized without a warrant." *United States v. Edwards,* 415 U.S. 800, 807, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *see also State v. Smith,* 295 Minn. 65, 70, 203 N.W.2d 348, 351–52 (1972) ("The seizure of defendant's boots at the time of booking was a valid search and seizure incident to arrest."). "This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial." *Edwards,* 415 U.S. at 807, 94 S.Ct. 1234. Accordingly, because we conclude that Jenkins' arrest was lawful, we also conclude that the seizure of Jenkins' clothing was lawful as a seizure incident to a lawful arrest.

## III.

■ Next, we address Jenkins' argument that items seized from his room at 1811 Quincy, including the cell phones and gun, should have been suppressed because the application for the warrant authorizing the search of the room was not supported by probable cause. More specifically, he contends that references to the cell phones and gun observed in his room were improperly included in the affidavit supporting the warrant application because the officers who provided information about the cell phone and gun were not lawfully in his room when those items were first discovered. He further contends that, when the cell phones and gun are excluded from the warrant application, the application is not supported by probable cause. In addition, he argues that the application was facially invalid because it misstated the destination supplied by the taxi driver.

■ When reviewing a district court's decision to issue a search warrant, our only consideration is whether the judge issuing the warrant "had a substan-

tial basis for concluding that probable cause existed." *State v. Rochefort,* 631 N.W.2d 802, 804 (Minn.2001). We review the district court's factual findings for clear error and the district court's legal determinations de novo. *State v. Buckingham,* 772 N.W.2d 64, 70 (Minn.2009). We give the district court's factual determinations great deference. *Rochefort,* 631 N.W.2d at 804. In doing so, we are to consider the totality of the circumstances and "must be careful not to review each component of the affidavit in isolation." *State v. Wiley,* 366 N.W.2d 265, 268 (Minn. 1985).

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Elements bearing on this probability determination include information establishing a nexus between the crime, objects to be seized and the place to be searched. *State v. Souto,* 578 N.W.2d 744, 747 (Minn.1998); 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 3.7(d) (4th ed. 2004).

Before trial, Jenkins sought to suppress the cell phones and gun found in his room by police officers. At that hearing, Jenkins argued that when the police discovered the cell phones and gun the police were unlawfully in his room. The State, arguing that the police were lawfully in the room, offered evidence indicating the two cell phones were observed by an officer in plain sight when the officer entered the room to allow Blount, who was in the room but unclothed, to dress before she was escorted out of the room. The State also provided evidence that another officer observed the gun in plain sight when that officer entered the room with Jenkins to allow Jenkins to get his shoes and coat.

The district court found that the police were lawfully in the room when the cell phones and gun were discovered because Jenkins requested permission to enter his room to retrieve his shoes and coat. Relying on testimony from Blount that the officers "eye searched" the room without moving anything and testimony from the officers that they did not have to move anything in the room in order to see the cell phones or gun, the court further found that those items were in plain sight and therefore were properly included in the search warrant application.

We are satisfied that the cell phones and the gun were properly included in the warrant application. We have held that an officer may lawfully accompany an arrestee into his room after an arrest outside the room in order for the arrestee to retrieve items such as a coat and shoes. *State v. Griffin,* 336 N.W.2d 519, 523–24 (Minn.1983). Here, the district court found that Jenkins asked that he be allowed to retrieve his shoes and coat from the room and that based on that request the officers were lawfully in Jenkins' room when they observed the cell phones and gun. The court's findings are supported by the record and are not clear error. Therefore, Jenkins' argument seeking suppression of the cell phones and the gun fails.

 His argument that the warrant was facially invalid because the affidavit misidentified the destination of the taxi that picked up the male and female passengers at 1714 Broadway as 1811 Quincy Avenue when it should have been 1807 Quincy Avenue has no merit. " 'Misrepre-

sentations invalidate a warrant when they are (1) deliberately or recklessly made, and (2) material to establishing probable cause, meaning probable cause could likely not be established without them.'" *State v. Mems,* 708 N.W.2d 526, 532 (Minn.2006) (quoting *State v. Jones,* 678 N.W.2d 1, 12 (Minn.2004)). Although the warrant application here misstates the location where the taxicab dropped the man and woman off, Jenkins has not pointed us to, and we have not found, anything in the record before us suggesting that the misstatement was deliberately or recklessly made or that the precise location of their drop off was material to establishing probable cause. Thus, Jenkins is not entitled to any relief on this claim.

## IV.

We next address Jenkins' argument that the district court erred in excluding evidence implicating Simms, Walker, Mack, and White as alternative perpetrators. Evidentiary rulings are within the discretion of the district court and will not be overturned absent an abuse of that discretion. *State v. Vance,* 714 N.W.2d 428, 436 (Minn.2006). However, the exclusion of alternative-perpetrator evidence "will almost invariably be declared unconstitutional when it significantly undermines fundamental elements of the defendant's defense." *Jones,* 678 N.W.2d at 16 (citation omitted) (internal quotation marks omitted). Every defendant has a constitutional right to present a complete defense, including evidence tending to prove another person committed the crime. *Id.* at 15–16, 19; *see also* Minn. Const. art. 1 § 6. This right is not absolute; courts may limit the defendant's evidence to ensure that the defendant does not confuse or mislead the jury. *State v. Hannon,* 703 N.W.2d 498, 506 (Minn.2005).

As a threshold matter, in order for alternative-perpetrator evidence to be admissible, the defendant must offer evidence having an inherent tendency to connect the alternative perpetrator to the commission of the charged crime. *Jones,* 678 N.W.2d at 16. The purpose of this foundational requirement is to "avoid[ ] the use of bare suspicion and safeguard[ ] a third person from indiscriminate use of past differences with the deceased." *State v. Richardson,* 670 N.W.2d 267, 280 (Minn. 2003) (quoting *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn.1977)). If the defendant fails to meet this foundational requirement, the alternative-perpetrator evidence is not admissible and the trial court need not consider any of the alternative-perpetrator evidence further. *State v. Palubicki,* 700 N.W.2d 476, 485 (Minn.2005). If the defendant meets the foundational requirement the defendant may then, subject to the ordinary rules of evidence, "introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act," in order to cast reasonable doubt on the State's case. *Hawkins,* 260 N.W.2d at 159; *see also State v. Bock,* 229 Minn. 449, 458–59, 39 N.W.2d 887, 892–93 (1949).

The district court found, based on the totality of all the evidence offered, that Jenkins failed to produce evidence having an inherent tendency to connect either Simms, Walker, Mack, or White to the commission of the charged crime. While it is difficult to identify Jenkins' precise claims of error, we understand Jenkins to be making three constitutional arguments challenging the foundational requirement for the admission of alternative-perpetrator evidence: (1) the requirement impermissibly places the burden of proof on the defendant; (2) it contains a deadline for the submission of such evidence which in-

terferes with a defendant's right to present a complete defense; and (3) the requirement violates a defendant's right to have a meaningful opportunity to present a complete defense as held in *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006). In addition, Jenkins argues that the evidence proffered satisfies the foundational requirement.

### A.

▮▮▮▮ Due process prevents the state from placing the burden of disproving *elements* of a crime upon the defendant. *State v. Cannady*, 727 N.W.2d 403, 408 (Minn.2007); *State v. Hage*, 595 N.W.2d 200, 204 (Minn.1999); *see also* U.S. Const. amend. XIV. Jenkins claims that requiring criminal defendants to show that the proffered alternative-perpetrator evidence has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime violates due process because it shifts the burden of proof to the defendant. This claim fails on its face.

Jenkins was charged with two counts of first-degree premeditated murder and two counts of first-degree felony murder. The elements of first-degree premeditated murder are the death of a human, defendant caused that death, defendant acted with premeditation, and defendant intended to kill the victim or another. Minn. Stat. § 609.185(a)(1) (2008). The elements of first-degree felony murder, in which the underlying felony is aggravated robbery, are the death of a human, defendant caused that death, defendant intended to kill the victim or another, and defendant was engaged in the act of committing or attempting to commit the crime of aggravated robbery when he caused the death. Minn.Stat. § 609.185(a)(3) (2008). The problem for Jenkins in making his burden-shifting claim is that the requirement that a defendant lay a proper foundation before alternative-perpetrator evidence will be admitted does not require Jenkins to produce evidence on an essential element of the charged offenses, nor did Jenkins' failure to lay a proper foundation for the alternative-perpetrator evidence prevent an essential element from ever reaching the jury. Thus, the district court did not require Jenkins to either prove or disprove any element of the offense. Because Jenkins was not required to either prove or disprove any element of the charged offense, his right to due process was not violated.

### B.

▮▮▮▮ Due process also includes the right to be treated with fundamental fairness and a meaningful opportunity to present a complete defense. *State v. Netland*, 762 N.W.2d 202, 208 (Minn.2009); *see also* U.S. Const. amend. XIV; Minn. Const. art. I, § 7. Jenkins' trial commenced on February 11, 2008. On January 11, 2008, Jenkins brought a motion seeking the admission of the alternative-perpetrator evidence because, according to Jenkins, the district court required that he address the admission of alternative-perpetrator evidence before trial. That motion was argued at a pretrial hearing on January 22 and 23. The district court denied Jenkins' motion on the record at the hearing and issued an order on February 1, 2008, formally denying the motion. Jenkins asserts that requiring the foundation for the admission of alternative-perpetrator evidence to be laid before trial violated his right to due process.

Presumably, Jenkins' complaint is that, by requiring him to raise the alternative-perpetrator issue before trial, he was in some way precluded thereafter from revisiting the admission of such evidence based on information discovered subsequent to the hearing but before the end of his trial.

This due process claim necessarily fails. The district court made clear at the time it denied Jenkins' motion that Jenkins was free to revisit the issue during trial if he felt there was other evidence available to meet the foundational requirement. Moreover, as Jenkins acknowledges in his brief and as the record bears out, he was permitted to, and in fact did, revisit the alternative-perpetrator issue on a number of occasions during the trial. In that the district court informed Jenkins that the alternative-perpetrator issue could be revisited and subsequently was revisited on a number of occasions during the trial, we conclude that Jenkins was not denied due process.

## C.

■ A defendant's right to present a meaningful defense includes the right to present evidence that a third party may have committed the crime for which the defendant is charged. *Jones*, 678 N.W.2d at 15–16; *see also* Minn. Const. art. 1 § 6. Jenkins contends, however, that the United States Supreme Court's holding in *Holmes v. South Carolina* renders our standard for admitting alternative-perpetrator evidence unconstitutional. We disagree. In *Holmes,* the Supreme Court declared unconstitutional South Carolina's law denying evidence of a third-party's guilt solely because the State had a strong forensic case. 547 U.S. at 330–31, 126 S.Ct. 1727. Our foundational requirement differs greatly in that admissibility depends exclusively on whether the evidence offered by the defendant inherently connects an alternative perpetrator to the commission of the charged crime regardless of the strength of the State's case. Furthermore, *Holmes* specifically identified *Jones* as an example of the "widely accepted" foundational requirement that "neither the petitioner nor his amici challenge." *Id.* at 327, 126 S.Ct. 1727. The

United States Supreme Court's decision in *Holmes* did not render the foundational requirement from *Jones* unconstitutional.

## D.

■ Jenkins further contends that, even if the foundational requirement is constitutional, he met the requirement with respect to each of the individuals and therefore the district court erred in denying the admission of the alternative-perpetrator evidence. With respect to White, Jenkins offered evidence indicating that White was present in Simms' triplex unit several hours before the murders occurred. The district court found this evidence insufficient to connect White to the commission of the charged crimes because "[m]ere presence at or near a crime scene does not in itself show an inherent tendency to commit the crime." Jenkins argues that showing a person's presence at a crime scene is sufficient to meet the foundational threshold and cites *State v. Palubicki,* 700 N.W.2d at 485–86, for that proposition.

We have consistently held and recently reaffirmed that "[m]ere presence at the scene of the crime does not, by itself, create an inherent tendency to connect a person alleged to be the alternative perpetrator to the commission of the charged crime." *State v. Atkinson,* 774 N.W.2d 584, 590 (Minn.2009) (citing *State v. Flores,* 595 N.W.2d 860, 868–69 (Minn.1999)). As for *Palubicki,* the case has to be read in context. In *Palubicki,* the defendant's effort to connect the alleged alternative perpetrator to the commission of the charged crime consisted only of a plan to rob the victim and the alternative perpetrator's alleged, yet unrelated, criminal activity. *Palubicki,* 700 N.W.2d at 485–86. The defendant did not assert that the alleged alternative perpetrator was present at the place and time of the crime. *Id.* at

486. Nor did the defendant offer any other evidence linking the alternative perpetrator to the charged crime. *Id.* In concluding that the district court did not abuse its discretion when it found that Palubicki failed to satisfy the foundational requirement, we simply noted that the evidence offered to satisfy the requirement not only did not "involve any evidence placing [the alleged alternative perpetrator] near the scene" of the charged crime it also did not "involve any evidence from which it could be inferred that [the alternative perpetrator] was present at the time" of the crime. *Id.* The import of what we said in *Palubicki* is that there was no evidence, not even presence, linking the alleged alternative perpetrator to the charged crime, much less to the commission of the charged crime. We did not hold that presence alone was sufficient to satisfy the foundational requirement. Thus, Jenkins' reliance on *Palubicki* is misplaced. Because the evidence submitted by Jenkins at most established that White was present in Simms' triplex unit at some point on the night of the charged crime, we conclude that the evidence did not have an inherent tendency to connect White to the actual commission of the charged crime. We therefore hold that the district court did not abuse its discretion when it found that Jenkins failed to satisfy the foundational requirement for the admission of alternative-perpetrator evidence related to White.

■■■ With respect to Mack, Jenkins only offered evidence that Mack was present in Simms' unit at some point on the night of the murders. The district court found that Jenkins failed to satisfy the foundational requirement. For the reasons discussed above, that finding by the district court was not an abuse of discretion. During trial, Jenkins obtained information that on the night of the murders Mack threatened to have someone kill Curry. Jenkins, however, did not seek to revisit the district court's earlier ruling with respect to Mack's alternative-perpetrator status. Having failed to revisit the ruling during trial, Jenkins cannot now complain that he was denied due process because the district court failed to allow Jenkins to introduce alternative-perpetrator evidence involving Mack. We also note that any failure to allow the admission of alternative-perpetrator evidence involving Mack likely had no impact on the jury's verdict. Jenkins did not make an offer of proof indicating what additional evidence he would have sought to admit at trial if he had satisfied the foundational requirement, and evidence of Mack's threat against Curry was admitted at trial, from which Jenkins was able to argue in closing that Mack could have been the shooter.

■■■ Jenkins' attempt to meet the foundational requirement with respect to Walker was also insufficient. Jenkins argued that Walker was present in the triplex at the time the murders occurred, told inconsistent stories regarding the identity of the shooter, knew the victims were dealing drugs from the triplex, and would lie to protect Simms. But, even if Walker was inconsistent in identifying who she saw leaving Simms' triplex unit the night of the murders or knew that the victims were dealing drugs from the unit or would lie for Simms, those facts do not in any way link Walker to the actual commission of the charged crime. Thus, the only offered evidence linking Walker to the charged crime was Walker's mere presence at the crime scene. And, as discussed above, evidence of mere presence does not satisfy the foundational requirement. Therefore, we hold that the district court did not err when it found the foundational requirement for the admission of alternative-

perpetrator evidence was not met with respect Walker.

At the pretrial hearing, Jenkins asserted that the following evidence had an inherent tendency to connect Simms to the actual commission of the charged crime: (1) Simms' presence in her triplex unit at the time of the murders; (2) Simms receiving threats from certain of the victims' family members alleging that Simms had committed the murders; (3) the victims were dealing drugs from Simms' triplex unit; (4) Simms' fingerprints were found on ordinary household objects in her residence; (5) Simms remained in the house for some amount of time before calling the police; (6) Simms' story, which included her identification of the person leaving her triplex unit after the shootings evolved from the 911 call until the time she testified; (7) Simms took medication for mental illness; (8) Simms had a cocaine habit; (9) Simms regularly mixed her medications with cocaine, resulting in violent outbursts, including an outburst that resulted in Simms throwing bleach in a man's face; and (10) Simms' flight to California shortly after the murders.

Based on our careful review of the record, we conclude that the district court did not err when it ruled that Jenkins did not meet the foundational requirement for the admission of alternative-perpetrator evidence relating to Simms. While the evidence proffered with respect to Simms places her at the scene at the time the crime occurred, the assertions made by Jenkins do not connect Simms to the commission of this crime. Moreover, our task is to determine whether the evidence, not the assertions, contained in the proffer provides the required "something more" than mere presence. We conclude that it does not. For example, Jenkins asserts that Simms "fled" to California, but the evidence merely shows that Simms went to California and does not indicate that she fled. Like the additional evidence proffered with respect to Walker, none of the additional evidence proffered with respect to Simms links Simms in any way to the actual commission of the charged crimes. We therefore hold that the district court did not err when it found that Jenkins did not satisfy the foundational requirement for the admission of alternative-perpetrator evidence with respect to Simms.

### V.

We next address Jenkins' claim that the district court erroneously excluded evidence showing bias on the part of Simms in favor of the prosecution. In its motion in limine, the State moved to exclude as irrelevant "[e]vidence regarding the decision of police not to place [Simms'] children on a hold for their protection and any evidence regarding the fact that the State reported Ms. Simms to child protection." The discussion at the hearing went as follows:

THE COURT: "The evidence regarding the decision of the police not to place children on a hold for their protection and any evidence regarding the fact that the State reported Miss Simms to Child Protection."

Why would that be relevant, defense team?

Why would it be relevant?

Well, first of all, do you oppose the motion?

MS. CLARK: I see it as two parts and yes, we would, and we do think it's relevant.

We think this is a typical way that police will turn mothers, is to hold in abeyance the threat that they'll take their children from them if they don't give them the information that they want.

We see this happen a lot.

It seems like it's fair game for why Cassandra Simms is changing her story in favor of the police theory of the case more and more as time goes on.

And then Part B, any evidence regarding the fact that the State reported Miss Simms to Child Protection, I'm not sure that I understand that.

Are the prosecutors talking about that they themselves got these children into the CHIPS system? I'm not sure.

THE COURT: Well, they did get into the CHIPS system, I guess.

MS. CLARK: You know, off the top of my head—I mean I'm—we're certainly not going to put the prosecutors on the stand.

I don't know.

Since I don't really understand the motion, I don't really know if it's going to be relevant.

It may be relevant to some other rulings the Court makes outside the hearing of the jury that has to do with these child witnesses, but to be honest, off the top of my head, I don't know.

I really don't.

THE COURT: Well, I'm going to grant that motion.

You have the right to reopen it if the circumstances change, the defense team.

The State also sought to exclude "[a]ny information about the CHIPS proceeding involving [D.F., J.F. and S.F.]." The discussion with respect to that evidence went as follows:

THE COURT: "Any information about the CHIPS proceeding involving [D.F., J.F. and S.F.]."

What's your reason for that motion?

MS. JOHNSTON: Well, your Honor, I think that the CHIPS proceeding would not be relevant.

It would not be relevant to the trial of this case and to the defendant's guilt or innocence whether or not Cassandra Simms was an unfit parent, whether or not she has had a transfer of legal custody in her case.

I think that's a collateral proceeding that is not relevant to this proceeding.

It is, to some degree, a confidential proceeding, and I guess on relevancy grounds alone I would think it would not be allowed.

THE COURT: Okay.

Any comment about that, Miss Waite or Miss Clark?

MS. CLARK: We talked about this over lunch, and we can't see that it would be an issue.

It's possible it could come in in a sideways way.

I mean we don't totally understand what happened with these CornerHouse tapes of them, but it's our understanding that that was done while they were actually in the custody of the State.

So that's the only way I could envision it coming in, but it's not like we want to put on evidence—

THE COURT: The motion is granted unless you get permission to do it.

 Construing Jenkins' counsel's arguments at the pretrial hearing liberally, it appears from the discussion that Jenkins objected to the part of the motions seeking to exclude evidence relating to the police not placing the children on a temporary hold for their protection, but did not object to the remainder of the motions. The district court excluded the evidence on relevance grounds. We review a trial court's evidentiary rulings for an abuse of discretion. *State v. Vance*, 714 N.W.2d 428, 436 (Minn.2006). Absent an objection, our review is for plain error and involves four steps. *Rairdon v. State*, 557 N.W.2d 318,

323 (Minn.1996). First, we ask (1) whether there was error, (2) whether the error was plain, and (3) whether the error affected the defendant's substantial rights; that is, "if [the error] had the effect of depriving the defendant of a fair trial." *Id.* If we determine that there was error that was plain and that affected the defendant's substantial rights, we "'then assess [ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings.'" *State v. Tscheu,* 758 N.W.2d 849, 863 (Minn.2008) (alterations in original) (quoting *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998)). If the answer to any one of the three initial questions is resolved in the negative, the claim fails and the defendant is not entitled to any relief. *State v. Gutierrez,* 667 N.W.2d 426, 433–34 (Minn.2003). An error is plain "if it was 'clear' and 'obvious.'" *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006) (quoting *State v. Strommen,* 648 N.W.2d 681, 688 (Minn.2002)). Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Minn. R. Evid. 401. Evidence that is not relevant is not admissible. Minn. R. Evid. 402.

Jenkins now claims that the excluded evidence was relevant and should have been admitted to show Simms' bias in favor of the prosecution. Specifically, he claims that the State both threatened to take Simms' children away if Simms did not cooperate with prosecutors and initiated a CHIPS proceeding as a "carrot" to obtain that cooperation. On the record before us, we conclude that the district court did not err when it excluded the evidence.

We first note that at the hearing on the motions, Jenkins did not specifically argue that any of the evidence relating to the police not placing the children on a hold, the State reporting Simms to Child Protection, and the children's CHIPS proceeding was relevant to showing that Simms was biased in favor of the State. While he did make the assertion that "a typical way that police will turn mothers, is hold in abeyance the threat that they'll take their children from them if they don't give them the information they want," Jenkins made no effort to connect that practice to what happened in this case. Nor did Jenkins attempt to explain how the fact that the State subsequently reported Simms to child protection or information about the CHIPS proceeding caused Simms to be biased towards the State. Further, we note that Jenkins made no showing of the ways in which Simms' statements changed to be more favorable to the prosecution between the time of the statement she gave to police identifying Jenkins as the one she saw leaving her triplex unit shortly after the murders occurred and the time of the motion hearing. Finally, we note that the record indicates that by the time of the motion hearing Simms' children were in the custody of the children's father and that Simms had the right to reasonable visitation.

In that Jenkins did not specifically argue at the motion hearing that the evidence was necessary to show bias on the part of Simms, or explain how the subsequent reporting of Simms to child protection or how information about the CHIPS proceeding showed bias on the part of Simms, the district court was not in a position to evaluate whether the evidence the State was seeking to exclude had a tendency to make Simms' bias towards the prosecution more or less probable than it would be without the evidence. The same is true with respect to Jenkins' failure to either provide any evidence or otherwise explain how the police practice of "turning mothers" caused Simms to be biased in

this case. Therefore, we conclude that the district court did not abuse its discretion or commit any error when it granted the State's motion to exclude the evidence on relevance grounds.

## VI.

■ Next, we address Jenkins' allegation that the police engaged in misconduct and violated his right to due process by targeting him to the exclusion of other suspects as evidenced, he claims, by the fact that within three hours of the murders the police had identified him as the shooter. To show motive for the misconduct, Jenkins sought to admit evidence of two lawsuits, one that he had successfully brought against the Minneapolis Police Department and one he had brought against the Minnesota Bureau of Criminal Apprehension (BCA). The district court ruled that, absent a showing by Jenkins that the police targeted Jenkins, evidence of a motive to target Jenkins was inadmissible because it would be irrelevant, speculative, and prejudicial. The district court made clear at the time it ruled, however, that if Jenkins later was able to provide evidence of targeting then evidence of motive would be admissible.

Jenkins' targeting claim fails. First, we conclude that the district court did not abuse its discretion when, after extensive discussion, it excluded evidence relating to the two lawsuits Jenkins claimed provided a motive for the police to target him. Although he had alleged targeting, at the time of the discussion Jenkins had not presented any evidence of targeting. As the district court noted, permitting motive evidence without a showing of targeting puts the cart before the horse. That is to say, until there is evidence of targeting, motive evidence is irrelevant, speculative, and prejudicial. Jenkins now argues that his targeting claim is supported by evi-

dence that a bullet found in the kitchen windowsill may have been planted. Whatever the merits of this argument are, the argument was not made to the district court at the time it was considering the admission of the motive evidence. Nor did Jenkins attempt to revisit the issue during trial, even though he raised the alleged planting of the bullet during cross-examination of a number of witnesses and strenuously argued during closing argument that the bullet was planted.

Moreover, the record belies Jenkins' targeting argument. The undisputed evidence indicates that when questioned by the police upon their arrival at Simms' triplex unit, Simms and Walker identified Jenkins as a person seen leaving the unit shortly after the murders. The police also learned within a short time that Porter's cell phone was missing and had been used after Porter's death to order a taxicab to take a man and a woman from 1714 Broadway in North Minneapolis to Quincy and 18–1/2 Street in Northeast Minneapolis, which was within a block of where Jenkins lived. In addition, they learned that Jenkins was in possession of a gun days before the murders. Further, when the police went to the rooming house where Jenkins lived, Jenkins answered the door and lied about his identity, they found the missing cell phone and a gun in his room, and after his arrest discovered bloodstains on the clothes he was wearing. This evidence amply supports the State's argument that the evidence led the police to Jenkins and, when coupled with our conclusion that the district court did not abuse its discretion when it excluded the motive evidence Jenkins sought to admit, Jenkins' due process argument necessarily fails.

## VII.

■ We next address Jenkins' prosecutorial misconduct claims.[1] In his post-

trial motion for a new trial, Jenkins argued, as he does here, that the prosecution: (1) failed to meet its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) interfered with his access to material witnesses; (3) interfered with his access to material evidence; and (4) failed to preserve and destroyed material evidence. We must determine if the State committed any misconduct and, if it did, "we will grant a new trial when the misconduct impaired the defendant's right to a fair trial." *State v. Graham,* 764 N.W.2d 340, 347 (Minn.2009) (citation omitted) (internal quotation marks omitted). "For objected-to prosecutorial misconduct, we have utilized a harmless error test, the application of which varies based on the severity of the misconduct." *State v. Wren,* 738 N.W.2d 378, 389 (Minn.2007) (noting that it has not been determined whether the two-tiered approach articulated in *State v. Caron,* 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974) "should continue to apply to cases involving objected-to prosecutorial misconduct" (quoting *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006))); *see also State v. Cabrera,* 700 N.W.2d 469, 473–74 (Minn.2005). For the most part, the district court found that there was no prosecutorial misconduct. To the extent that the court found misconduct, it concluded that the misconduct did not result in any prejudice to Jenkins by impairing his right to a fair trial. Our review of the record leads us to the conclusion that the district court was correct.

■ With respect to his claim that the prosecution violated its obligations under *Brady v. Maryland,* Jenkins asserts that the State did not disclose blood spatter pictures from the crime scene, research from a shoeprint expert, that same expert's second report, and a threat made by Mack just hours before the murders that she would send someone to shoot Curry. Rule 9.01, subdivision 1, of the Minnesota Rules of Criminal Procedure, requires the prosecution to disclose, without order of the court, upon request of the defense counsel, any matters within the prosecuting attorney's control including photographs, reports, and other expert opinions that tend to negate or reduce the guilt of the accused. The failure of the prosecution to disclose evidence is grounds for a new trial if the evidence is material. *Pederson v. State,* 692 N.W.2d 452, 459–60 (Minn.2005) (citing *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972)); *see also Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment."). However, even if the State violated its *Brady* obligations, relief will be granted only if the misconduct impairs the defendant's right to a fair trial. *Graham,* 764 N.W.2d at 347.

■ With regard to the blood spatter pictures, Jenkins argues that over 90 pictures were taken of blood spatter at the crime scene six days after the murders and were not disclosed to the defense until the weeks leading up to trial. Jenkins does not claim that he first received the photos on the eve of trial or after the trial

---

1. We address Jenkins' claims of prosecutorial misconduct based on what we understand those claims to be. The claims, which are unclear at best, are presented in an argumentative and cumbersome charted format and provide no citation to the record or law. As a result, deciphering Jenkins' specific claims of prosecutorial misconduct is challenging. While we address Jenkins' claims to the extent possible, we caution that such formatting and the use of unsupported arguments are strongly disfavored.

started, and the record is not clear as to precisely how long the photos were in his possession before trial began. Jenkins claims, however, that he received the photos when it was "too late for the Defense to be able to utilize them" because the defense "blood spatter and ballistics experts had come and gone." Jenkins argues that these photos were disclosed too late, preventing him from fully exploiting the fact that the photos conclusively show that there had to be more than one shooter.

On the record presented, we conclude that any late disclosure of the photos did not interfere with Jenkins' right to a fair trial. At the outset, we note that Jenkins does not complain about the timeliness of the State's disclosure of other photos and a videotape of the crime scene taken the morning of the murders. Jenkins used these other photos and the videotape at trial. We also note that, although Jenkins makes the bare assertion that his blood spatter and ballistics experts "had come and gone" by the time the 90 photos were disclosed to him, he does not explain why the photos could not have been transmitted to the experts for their consideration before the trial started or how the photos could have been used differently to produce a different result at trial. More importantly, the record is clear that Jenkins received the photos before trial and was able to use them at trial, offering a number of them as trial exhibits. Further, Jenkins was not precluded from and, in fact, did argue to the jury that the blood-spatter evidence indicated that there was more than one shooter.[2] On this record, we conclude that any late disclosure of the 90 photos did not prejudice Jenkins and, therefore, he is not entitled to relief.

Jenkins similarly argues that some of the research from the State's shoeprint expert and the expert's second report were disclosed too late to be used. The State had a shoeprint expert analyze three shoeprints taken from the floor near one of the bodies. The expert generated an initial report, which the State timely disclosed to the defense. Subsequent to that report, the expert conducted additional research and prepared a supplemental report based on that research. The State learned of the additional research and supplemental report on the morning the expert was set to testify and disclosed the report to the defense before the expert testified but failed to disclose the research. As with Jenkins' claim concerning the untimely disclosure of the photos, Jenkins does not explain, and we fail to see, how his trial tactics or the outcome of the trial would have been different had this evidence been available to him earlier. Further, as the district court found when it ruled on this issue while addressing Jenkins's post-trial motion, the shoe expert's research and subsequent report were not exculpatory and the State did not use the evidence at trial. Therefore, we conclude that Jenkins is not entitled to relief on this claim.

In his post-trial motion, Jenkins claimed, as he does here, that the State failed to disclose Mack's threat to have someone kill Curry. Jenkins argued then, as he does now, that the "[f]ailure to timely disclose [the threat] prior to the alternative perpetrator deadline prejudiced [Jenkins]." The district court rejected this claim, finding that the State learned of this evidence at trial, at the same time the defense did. Because we review the dis-

---

**2.** We note in passing that the fact that there may have been more than one shooter does not exclude Jenkins as one of those shooters.

trict court's factual findings for clear error, *State v. Buckingham,* 772 N.W.2d 64, 70 (Minn.2009), and because our careful review of the record satisfies us that the district court's finding is supported by the record, we conclude that it was not clearly erroneous. Therefore, we hold that there was no Rule 9.01 or *Brady* violation.

■ Jenkins also claims that the State actively interfered with his access to witnesses when it reported Simms to child protection. First, Jenkins contends that the State reported Simms to child protection for the purpose of preventing the defense from having access to the children. This argument is without merit. In denying relief on this part of Jenkins' post-trial motion, the district court found that the State did not report Simms to child protection for the purpose of denying Jenkins' defense team access to the children. That finding is supported by the record. Further, as the district court noted, the State provided the defense contact information for the children and their father, Dwayne Fowler. Jenkins is not entitled to relief on this claim.

■ We do find merit in Jenkins' claim that the State interfered with Jenkins' access to Simms' children by discouraging Dwayne Fowler from meeting with attorneys for the defense. Under Minnesota Rules of Criminal Procedure, Rule 9.03, subdivision 1, neither counsel for the prosecution or the defense shall advise persons to refrain from discussing the case with opposing counsel or "otherwise impede opposing counsel's investigation of the case." Based on an affidavit from Dwayne Fowler, Jenkins asserts that the State told Fowler not to speak with the defense team and disparaged the defense team when it made certain statements to Fowler that described the defense attorneys as "dangerous and bulldogs" and "hounds" who would stop at nothing to acquit their client.

The district court found that the State's conduct was not improper. We disagree.

In *State v. Mussehl,* we disapproved of letters sent by the prosecution that went beyond advising the witnesses of their right to decline interviews and included a discussion about the defense attorney's obligations, including a statement that "[a] defense attorney in a criminal case is ethically obligated to do everything within his power to defend the person charged with the crime. In practice this means that he will be trying to get his client acquitted." 408 N.W.2d 844, 845 (Minn.1987). We held those letters to be improper. Here, the prosecutor's statement suggesting that defense counsel would stop at nothing to acquit their client is similar to the statement we held improper in *Mussehl.* Moreover, disparaging defense counsel by calling them "dangerous and bulldogs" and "hounds" has the clear potential to impede defense counsel's ability to investigate the case. Further, to the extent that the State pressured Fowler not to speak with the defense team, that conduct also had the potential to interfere with Jenkins' access to witnesses. Thus, we conclude that the State violated Rule 9.03, subdivision 1.

■ A defendant is not entitled to any relief, however, unless he is able to show that the violation "prejudicially impeded his investigation of the case." *Mussehl,* 408 N.W.2d at 847. Here, Jenkins has failed to show that the prosecution's conduct impeded his investigation. As the district court found when it ruled on Jenkins' post-trial motion, the State's conduct did not impede Jenkins' investigation because the defense attorneys were able to speak with Simms' two youngest children before the children testified, and "[Dwayne Fowler] demonstrated his independence when he declined to allow attorneys from either side to interview his children until

just before trial." Therefore, Jenkins is not entitled to relief on this claim.

■ Jenkins further alleges that the State interfered with his access to the gun and bullets by not allowing his expert to have unsupervised access to those items. This was not misconduct. We have never held, and decline to hold here, that a defendant's expert is entitled to unsupervised access to evidence in the State's possession.

■ Jenkins also argues that the State interfered with his access to the gun when it surreptitiously videotaped his expert's examination of the gun in violation of the district court's discovery order requiring that the State should not be "looking over [the expert's] shoulder." Because Jenkins does not explain how the State's act of videotaping his expert's examination of the gun impeded his investigation or otherwise resulted in prejudice to him, we conclude that he is not entitled to any relief on this claim.

■ Finally, we address Jenkins' claims that he is entitled to an acquittal because the State destroyed material evidence, thus denying him a fair trial. A defendant's right to due process of law is implicated when the State loses, destroys, or otherwise fails to preserve material evidence. State v. Krosch, 642 N.W.2d 713, 718 (Minn.2002) (citing Arizona v. Youngblood, 488 U.S. 51, 56–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), and California v. Trombetta, 467 U.S. 479, 486–91, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)). The duty to preserve evidence only applies to evidence that is actually collected during the investigation of the crime because "it would be illogical" to require the State to preserve evidence it does not possess. Krosch, 642 N.W.2d at 718. The failure to preserve potentially useful evidence that is actually collected during a criminal investigation

does not constitute a denial of due process unless the defendant shows bad faith on the part of the police. State v. Bailey, 677 N.W.2d 380, 393 (Minn.2004) (citing Youngblood, 488 U.S. at 58, 109 S.Ct. 333); see also Illinois v. Fisher, 540 U.S. 544, 547–48, 124 S.Ct. 1200, 157 L.Ed.2d 1060 (2004). Thus, when analyzing a destruction-of-evidence claim, "we consider whether the destruction was intentional and whether the exculpatory value of the lost or destroyed evidence was apparent and material." State v. McDonough, 631 N.W.2d 373, 387 (Minn.2001) (explaining that State's intentional release of the motor vehicle in which the victims were killed did not violate McDonough's right to due process because McDonough failed to show that the evidence had exculpatory value); see also State v. Friend, 493 N.W.2d 540, 545 (Minn.1992). When the evidence is destroyed as a result of intentional conduct, we consider whether there is any evidence that the State destroyed or released the evidence " 'to avoid discovery of evidence beneficial to the defense.' " Bailey, 677 N.W.2d at 393 (quoting State v. Koehler, 312 N.W.2d 108, 109 (Minn.1981)).

■ Jenkins first claims that the police failed to collect GPS data from the taxicab that allegedly transported Jenkins after the murders, failed to collect a wallet at the crime scene, failed to collect a pair of shoes visible in the police photos of the crime scene, and "did nothing to trap any civilian shoes or impressions" from the crime scene. Because the police had no obligation to collect any of this evidence, these claims necessarily fail.

■ Jenkins also argues that the police improperly released Porter's car to Porter's brother before his defense team had a chance to examine it for evidence. This claim also fails. Although the police looked in it the night of the murders to see if Porter's cell phone was inside, Jenkins

does not allege and the record does not indicate that the car played any role in the murders. He does allege that a cell phone charger found in the car could have been exculpatory if it did not match the cell phone found in Jenkins' room. However, the phone number provided by Porter's brother matched the phone number of the cell phone found in Jenkins' room, is the same number of the phone that Porter used to call his brother earlier in the evening, and is the same number from which the person who ordered the taxicab for 1714 Broadway called. Thus, even if the cell phone charger in the car did not match the cell phone found in Jenkins' room, the evidence would not have been exculpatory.

■ Next, Jenkins challenges what he claims to be the State's destruction of Jenkins' pants, which the State cut into sections in order to test the blood found on them. Jenkins asserts that the sectioning of the pants prevented him from showing that the police planted the blood. Because the record indicates that pants were photographed extensively before the bloody sections were cut for testing and all of the samples and the test results were made available to the defense, we conclude that blood evidence on the pants was properly preserved and turned over to the defense.

■ Jenkins also claims that the State failed to meet its obligation to preserve the blood evidence on the gun. Jenkins argues that removing the blood from the gun prevented the defense from showing that the blood spatter patterns on the gun found in Jenkins' room proved that it could not have been the murder weapon. Again, we disagree. The State photographed the blood evidence as it was found on the gun and made those photographs, along with the results of its DNA testing of that blood evidence, available to Jenkins. In addition, swabs of the blood evidence from the gun were preserved and made available to Jenkins so that he could conduct his own DNA tests. Because photographs of the blood evidence on the gun were made available to Jenkins, along with the results of the State's DNA testing and swabs of the blood evidence, we conclude that Jenkins' failure-to-preserve claim has no merit.

■ Jenkins further argues that the State destroyed evidence when, for purposes of testing, the police cleaned three bullets and a bullet fragment connected to the victims and the crime scene, denying him the opportunity to have his own expert test the bullets in their original state. He claims that this destruction of evidence prevented him from showing that the police planted the gun, the bullets, and the bullet fragment.

The record indicates that one of the bullets was recovered from inside the shirt of one of the victims by the medical examiner's office during the victim's autopsy, and that a bullet fragment was removed from the body of one of the victims during his autopsy. As is the practice of the medical examiner's office, the bullet and the bullet fragment were washed, placed in sealed envelopes marked for identification purposes, and turned over to the police investigators. The other two bullets were recovered by the police at the scene, property inventoried, and retained by the police. One of the bullets was recovered from the kitchen floor and the other from a windowsill in the kitchen. All three bullets and the bullet fragment were given to the BCA for further testing to determine if they were fired from the gun recovered from Jenkins' room. Because biological material such as blood, human flesh, and bone cause bullets to deteriorate, it is the BCA's practice to wash bullets it receives from the police for testing in a bleach solution. This practice was followed with the three bullets and the

bullet fragment. Once cleaned, the BCA conducted comparison tests to determine whether the bullets and the fragment were fired by the gun found in Jenkins' room. The results of those tests were inconclusive, that is, the three bullets and the bullet fragment could not be directly linked to the gun nor could they be conclusively excluded as having been fired from the gun.

We hold that Jenkins has not shown bad faith on the part of the medical examiner or the BCA in cleaning the bullets. Further, there is no evidence that the bullets were cleaned "to avoid discovery of evidence beneficial to the defense." *See Bailey,* 677 N.W.2d at 393. In fact, the record indicates that the medical examiner and the BCA followed their standard practice in the handling of these bullets. Further, we note that even if we were to conclude that Jenkins had shown bad faith, we would also conclude that the failure to preserve biological material from the bullets was harmless beyond a reasonable doubt. *See Cannady,* 727 N.W.2d 403, 408–09 (Minn.2007) (explaining that constitutional error is not reversible error when the error is harmless beyond a reasonable doubt); *State v. Richardson,* 670 N.W.2d 267, 279 (Minn.2003) (explaining that if the verdict is surely unattributable to the error, then the error is harmless beyond a reasonable doubt). In light of the direct link between Jenkins and the gun, and the victims and the gun, any failure to preserve biological material from the bullets and bullet fragment could not have prejudiced Jenkins. The gun itself was directly linked to Jenkins. It was found in his room with his fingerprint on it. The gun was also directly linked to one of the victims. Porter's blood was on the gun when it was seized from Jenkins' room. Thus, the connection between the gun and victims did not depend on the bullets and bullet fragment. In addition, the bullets and bullet fragment could not have played a significant role in establishing the connection between the gun and the victims because the ballistic testing was inconclusive. Based on the record in this case, the verdict was surely unattributable the State's failure to preserve the biological material that was on the bullets and bullet fragment.

In summary, we hold that Jenkins has failed to establish any misconduct on the part of the State entitling him to any relief.

## VIII.

■ Jenkins next argues the district court erred in denying his request for a new trial based on newly discovered evidence. Jenkins claims that information he learned from D.F.'s trial testimony implicating "Mooki" as the person who shot Curry and Porter constitutes newly discovered evidence. We have held that a defendant's new trial motion based on newly discovered evidence should be granted if: "(1) the evidence was not known to him or his counsel at the time of trial; (2) the failure to learn of the new evidence was not because of lack of diligence; (3) the evidence is material and is not impeaching, cumulative, or doubtful; and (4) the evidence is likely to produce an acquittal or more favorable result for the defendant." *State v. Fort,* 768 N.W.2d 335, 344 (Minn. 2009).

Jenkins' assertion that he first learned of the evidence implicating "Mooki" as the shooter from D.F.'s trial testimony causes this claim to fail because he cannot establish that "the evidence was not known to him during the time of trial." In addition to "Mooki" being implicated in D.F.'s testimony, the district court noted in its memorandum and order denying Jenkins' new trial motion that "Mr. Fowler testified that

he had seen 'Mooki' in a car outside 2922 Dupont several hours after the murders." Through Ms. Clark's affidavit, we learn for the first time that Mr. Fowler actually told her *during the trial* that "word on the street" was that Mooki and Wright had committed the murders. Yet, as the district court noted:

> Testimony in this case ended early on March 21, 2008. The defendant had the balance of that day and a weekend to investigate Mr. Fowler's claim that Mooki and Wright were involved in the murders. Moreover, the defense could have asked for a continuance to further investigate these issues. Instead, the defense did not even disclose this rumored information to the Court or the State. The defense never sought a recess to explore their theories further. The record clearly demonstrates that this information was known to the defense at trial and they chose not to pursue it. (Footnote omitted).

Because the record supports the district court's finding that Jenkins knew about the allegations against "Mooki" before the end of trial but did not seek a recess to explore Mooki's involvement in the murders or otherwise pursue the theory that Mooki was the shooter, we hold that the district court did not err when it denied Jenkins' new trial motion based on newly discovered evidence.

## IX.

Jenkins' final argument is that the district court violated Minn.Stat. § 609.035, subd. 1, when the court sentenced him to two consecutive life terms. This argument is wholly without merit. We have consistently held that the imposition of consecutive sentences for crimes involving multiple victims is permissible. *See, e.g., State v. McLaughlin,* 725 N.W.2d 703, 717 (Minn.2007) (affirming two consecutive life sentences for the murder of two students); *State v. Warren,* 592 N.W.2d 440, 452 (Minn.1999) (holding that trial court abused its discretion in imposing concurrent sentences, as opposed to consecutive sentences, upon defendant who shot and killed three victims at close range); *State v. Brom,* 463 N.W.2d 758, 765 (Minn.1990) (holding that three consecutive life sentences were commensurate of defendant's murdering of four family members); *Bangert v. State,* 282 N.W.2d 540, 547 (Minn.1979) (affirming two consecutive life sentences for a double homicide).

Affirmed.