*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0815**

State of Minnesota,
Respondent,

vs.

Dane Joseph Riley,
Appellant.

**Filed June 22, 2015
Affirmed
Peterson, Judge**

Cass County District Court
File No. 11-CR-12-1586

Lori Swanson, Attorney General, Michael T. Everson, Assistant Attorney General, St. Paul, Minnesota; and

Christopher J. Strandlie, Cass County Attorney, Walker, Minnesota (for respondent)

Melissa V. Sheridan, Assistant State Public Defender, Eagan, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Peterson, Judge; and Worke, Judge.

**U N P U B L I S H E D   O P I N I O N**

**PETERSON**, Judge

In this appeal from convictions of second-degree intentional murder, interference with a dead body with intent to mislead the coroner or conceal evidence, and ineligible

firearm possession, appellant argues that the district court erred by refusing to (1) suppress the evidence police obtained pursuant to a search warrant executed on appellant's home and surrounding property and buildings; and (2) instruct the jury that circumstantial evidence must exclude every rational hypothesis except that of guilt. We affirm.

**FACTS**

In July 2012, appellant Dane Joseph Riley and his girlfriend, J.T., lived in a mobile home on land near Pine River that appellant's father, J.B., owned. J.B.'s residence and welding business were also located on the property.

*1.      Events of July 13-14, 2012*

During the afternoon on July 13, appellant and J.T. went to their friend T.K.'s house. Several other people were there. Appellant and others were smoking methamphetamine. Appellant and J.T. returned to their home to watch television, and J.T. went to bed at about 10:00 p.m.

M.A.H. had been at T.K.'s house earlier in the day but left to buy methamphetamine. M.A.H. did not return to T.K.'s house until late that night and was still there at about 2:00 a.m. At some point, appellant returned to T.K.'s house looking for a backpack that he thought had been stolen from him.

J.T. testified at trial that she was awakened by the sound of two gunshots. She went outside and saw appellant beating up M.A.H., who was on the ground on his back, and appellant was straddling him and punching him. M.A.H. was yelling, "Stop, Dane, I won't tell anybody." Appellant swore at J.T. and told her to go back inside, which she

2

did. When appellant came inside, he made J.T. promise not to tell anyone what she had seen. J.T. noticed that appellant's hands were very dirty and "looked all black," and the next morning, she noticed a deep cut on his finger.

2.    *Police Investigation*

After not hearing from M.A.H. for about one week, his mother became concerned and began contacting his friends, including appellant. Appellant said that he had dropped M.A.H. off on County Road 2 and that M.A.H. was going to Cass Lake. No one else knew anything about M.AH.'s whereabouts, so M.A.H.'s mother filed a missing-person report.

Cass County Sheriff's Investigator Anthony Cyr contacted some of M.A.H.'s associates, including appellant. Appellant said that the last time he saw M.A.H., M.A.H. had left with a girl and gone to Cass Lake. Authorities became concerned that M.A.H.'s disappearance was more serious than a missing-person case because M.A.H.'s use of his cell phone, which had been prolific, and of his debit card had abruptly stopped. There was no record of any phone calls or texts after 4:10 a.m. on July 14, and the debit card was not used after July 13.

Based on reports that appellant was one of the last people to talk to M.A.H., Cass County Sheriff's Investigator Robert Stein decided to obtain a statement from appellant. Appellant said that he had last seen M.A.H. on July 13, probably sometime before midnight. Appellant said he had picked up M.A.H. at T.K.'s house and dropped him off on County Road 1 just outside of Pine River. Appellant said that M.A.H. had indicated that he was going to Cass Lake to see a new girlfriend, and appellant thought that M.A.H.

3

might be getting a ride from the new girlfriend. Appellant said he suspected that M.A.H. might be going to Cass Lake for drugs.

One of appellant's neighbors reported to police that she heard gunshots at about 4:20 a.m. on July 14. After the shots, the neighbor heard a panicked male voice repeatedly yelling "Dan, no!" The neighbor also heard a female voice but could not hear what the female was saying.

On July 24, Bureau of Criminal Apprehension (BCA) Special Agent Chad Museus prepared an application for a warrant to search J.B.'s property, including appellant's home, outbuildings, vehicles, equipment, and surrounding property, but excluding J.B.'s residence. While Museus was preparing the application, BCA Senior Special Agent Donald Newhouse talked to M.A.H.'s brother, M.L.H., who said that friends and family members were planning to search for M.A.H. in wooded areas near Pine River. Newhouse instructed M.L.H. to stay off of J.B.'s property because law enforcement intended to obtain a search warrant for J.B.'s property.

In the search-warrant application, Museus stated: (1) M.A.H.'s mother reported him missing on July 20 because he had had no contact with her or any family members for a week; (2) M.A.H.'s cell-phone records showed a large volume of calls for the days before July 14 but no calls or text messages after 4:10 a.m. on July 14, and the last known location of the phone was west of a tower located near J.B.'s property; (3) M.A.H.'s financial records showed no activity after July 13; (4) no law-enforcement officer had run M.A.H.'s name after July 13, and he was not in custody anywhere; (5) several witnesses reported that M.A.H. was at a party at T.K.'s residence on July 13, and one witness said

4

that M.A.H. was at T.K.'s after midnight and left at about 4:00 a.m. on July 14; (6) that witness believed that appellant picked up M.A.H. because M.A.H. left in a car with a loud muffler, and appellant's car had a loud muffler; (7) one of appellant's neighbors heard two gunshots at about 4:20 a.m. coming from the general direction of appellant's home and a panicked male voice repeatedly yelling "Dan, No!"; (8) M.L.H. had left a semi-automatic handgun at appellant's home about six weeks earlier, and when questioned by M.L.H., J.T. said that she did not know the handgun's present location; (9) after waiving his *Miranda* rights, appellant told investigators that during the late evening hours of July 13, he drove M.A.H. from T.K.'s residence to an area on County Road 1 southwest of Pine River and that he believed that he drove his father's pickup truck; (10) J.T. recalled that appellant drove a car, not his father's truck, to pick up M.A.H.; and (11) when appellant returned, he told J.T. that he dropped M.A.H. off on County Road 2 near Pine River.

Before Museus presented the application to the district court, he learned that searchers had found a fresh burn site that contained damaged pieces of clothing and remnants of a tennis shoe, and Museus added that information to the application. Newhouse and BCA Special Agent Eric Jaeche went to the burn site. Searchers told the investigators that the burn site was on state land about a quarter mile south of J.B.'s property. Investigators later learned that the burn site was about 25 yards north of J.B.'s southern property line.

On July 24, the district court issued a search warrant that authorized officers to search appellant's home, surrounding land, and outbuildings. During the search,

5

investigators found a burial site on J.B.'s land near appellant's home. The burial site consisted of two fresh mounds of dirt that contained M.A.H.'s burned and dismembered body. Investigators also found weapons and other evidence that linked appellant to M.A.H.'s death.

Appellant was charged with one count each of second-degree intentional murder, interference with a dead body, and ineligible person in possession of a firearm. Appellant moved to suppress evidence obtained as a result of the July 24 search warrant, a July 27 warrant to search J.B.'s truck, a July 27 warrant to obtain a DNA sample from appellant, and a July 30 warrant to search appellant's home a second time. The district court denied the motion as to the July 24 and 27 warrants but granted it as to the July 30 warrant. A jury found appellant guilty as charged, and the district court sentenced appellant to an executed prison term. This appeal followed.

## D E C I S I O N

When reviewing whether a search warrant is supported by probable cause, we afford great deference to the district court's probable-cause determination. *State v. Rochefort,* 631 N.W.2d 802, 804 (Minn. 2001). Our only consideration is "whether the judge issuing the warrant had a substantial basis for concluding that probable cause existed." *State v. Jenkins,* 782 N.W.2d 211, 222-23 (Minn. 2010) (quotation omitted). There is a strong preference for searches conducted pursuant to a search warrant, and "doubtful or marginal cases should be largely determined by the deference to be accorded to warrants." *Rochefort,* 631 N.W.2d at 804 (quotation omitted).

Probable cause is to be determined under a "totality of the circumstances" test:

6

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Jenkins,* 782 N.W.2d at 223 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)). "[A] collection of pieces of information that would not be substantial alone can combine to create sufficient probable cause." *State v. Jones,* 678 N.W.2d 1, 11 (Minn. 2004).

Appellant argues that the July 24 search warrant was not supported by probable cause and, therefore, the evidence discovered as a result of it should have been suppressed. In making this argument, appellant challenges the legality of the search that resulted in the discovery of the burn site. Although the district court determined that the burn site was legally discovered, it also found that the other information in the search-warrant application was sufficient to establish probable cause that evidence of a crime would be discovered at appellant's home. When a search-warrant application contains information discovered as a result of an illegal search, the district court must determine whether the other information in the application establishes probable cause and whether the police would have applied for the warrant without the information discovered as a result of the illegal search. *State v. Lieberg*, 553 N.W.2d 51, 55 (Minn. App. 1996). The other information in the search-warrant application was that family members had had no contact with the victim for a week; the victim's cell-phone and credit-card records raised a suspicion that he had not disappeared voluntarily; his cell phone was last used near

7

appellant's home, and there was evidence that he had left T.K.'s house with appellant at about 4:00 a.m. on July 14; there were inconsistencies between what appellant told police and what J.T. recalled regarding when appellant picked up the victim, where he dropped off the victim, and which vehicle he was driving; and, at about 4:20 a.m. on July 14, appellant's neighbor heard gunshots and a man screaming in a panicked voice, and the sounds came from the general direction of J.B.'s property. This information was sufficient to establish a reasonable probability that the victim's disappearance was the result of a criminal act and that evidence of the crime would be found on the property for which the search warrant was obtained. Because the information in the search warrant other than the information about the burn site was sufficient to establish probable cause and because the police were already in the process of applying for the search warrant when the burn site was discovered, we need not address the legality of the search resulting in discovery of the burn site.

## II.

A district court has broad discretion in determining how to instruct a jury. *Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014). This court will not reverse when jury instructions, viewed as a whole, fairly and accurately state the law in a manner that the jury can understand. *State v. Scruggs*, 822 N.W.2d 631, 642 (Minn. 2012). Error in instructing a jury warrants reversal "only if it cannot be said beyond a reasonable doubt that the error had no significant impact on the verdict." *State v. Koppi*, 798 N.W.2d 358, 364 (Minn. 2011).

The district court instructed the jury: "A fact may be proven by either direct or circumstantial evidence or by both. The law does not prefer one form of evidence over the other. . . . A fact is proven by circumstantial evidence when its existence can reasonably be inferred from other facts proven in the case." *See* 10 *Minnesota Practice*, CRIMJIG 3.05 (5th ed. 2014) (pattern instruction on direct and circumstantial evidence). Appellant requested the following instruction instead of the pattern instruction:

> When considering the evidence in this case, your inquiry is not simply whether the inferences leading to guilt are reasonable, although that is necessary in order to convict, it MUST also be true that there are no reasonable, rational inferences that are inconsistent with guilt because if any one or more circumstances found proved are inconsistent with guilt, or consistent with innocence, then reasonable doubt as to guilt arises.

In *State v. Gassler*, the supreme court emphasized that it had explicitly approved the pattern jury instruction as an appropriate instruction on circumstantial evidence. 505 N.W.2d 62, 68 (Minn. 2007) (citing *State v. Turnipseed*, 297 N.W.2d 308, 312 (Minn. 1980)). The court explained that while the rational-hypothesis test is appropriate for determining the sufficiency of the evidence on appeal, it "does not apply to jury instructions." *Id.* The court also stated that "the better rule is that where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is confusing and incorrect." *Id.* (quotation omitted). The supreme court recently re-affirmed *Turnipseed*. *State v. Fox*, ___ N.W.2d ___, ___, 2015 WL 1810482, at *12 (Minn. 2015). The district court did not err in giving the pattern instruction on circumstantial evidence.

9

## III.

In a pro se brief, appellant argues that he received ineffective assistance of counsel. To establish an ineffective-assistance claim, a defendant "must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) that a reasonable probability exists that the outcome would have been different but for counsel's errors." *State v. Caldwell,* 803 N.W.2d 373, 386 (Minn. 2011). Because appellant provides no citations to the record supporting the allegations underlying his argument that he received ineffective assistance, the argument is waived. *See State v. Krosch*, 642 N.W.2d 713, 719-20 (Minn. 2002) (deeming issue raised in pro se brief as waived when appellant failed to provide legal or factual support for argument).

Appellant also argues that J.T. should not have been allowed to testify because her statement about the altercation between appellant and M.A.H. was coerced and because there were inconsistencies within and between her statement and trial testimony. We "defer to the fact-finder on determinations of credibility." *State v. Watkins,* 650 N.W.2d 738, 741 (Minn. App. 2002). The "resolution of conflicting testimony is the exclusive function of the jury[, which] has the opportunity to observe the demeanor of witnesses and weigh their credibility." *State v. Lloyd,* 345 N.W.2d 240, 245 (Minn. 1984). And inconsistencies in the state's case do not require reversal. *Id.* J.T. testified at trial that she was arrested for the murder of M.A.H. and for tampering with a dead body. The jury, therefore, knew that J.T. had a reason to cast blame on appellant. It was the jury's role to consider this fact when evaluating the credibility of J.T.'s trial testimony.

**Affirmed.**