**STATE of Minnesota, Respondent,**

v.

**Darryl COLBERT, Appellant.**

**No. A05–855.**

Supreme Court of Minnesota.

July 6, 2006.

John M. Stuart, State Public Defender, Michael F. Cromett, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, David C. Brown, Assistant County Attorney, Minneapolis, MN, for Respondent.

## O P I N I O N

PAGE, Justice.

On December 26, 2003, Robert Mitchell was shot and killed on the 2800 block of Columbus Avenue in Minneapolis. Appellant Daryl Colbert was arrested and indicted for first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2004), and second-degree intentional murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2004), for Mitchell's death. Colbert was tried before a Hennepin County jury in November 2004. That trial resulted in a hung jury and a mistrial. On retrial in January and February 2005, another Hennepin County jury found Colbert guilty of premeditated first-degree murder and the trial court imposed the mandatory sentence of life imprisonment. Colbert raises three issues in this direct appeal: (1) the evidence was insufficient to support the conviction; (2) the trial court erred when it failed to dismiss the case based on an alleged discovery violation by the state during trial; and (3) the prosecutor committed prejudicial misconduct. We affirm.

The record from Colbert's trial indicates that on December 26, 2003, Mitchell and Gladys Rogers became engaged. To celebrate, Mitchell and Rogers went to Sunny's, a bar and restaurant on Lake Street and Chicago Avenue in Minneapolis, arriving there around 3:00 p.m. While at Sunny's, they were joined by several friends, including Kathleen Washington and Clarence Ealey.

Colbert, wearing a long coat and a brimmed, fedora-style hat, arrived at Sunny's at 5:33 p.m., according to Sunny's

surveillance videotapes. Although Colbert was not a member of Mitchell's party, Washington saw Colbert walk over to Mitchell and have a conversation, during which she heard Colbert and Mitchell mention $50. Washington thought Colbert was wearing a brimmed hat and a long, trench-style coat, which went past his knees and might have been made of cashmere. Ealey saw a person wearing a long, full-length dark coat and a dark fedora-style hat talking to Mitchell.

At about 6:00 p.m., Mitchell told Rogers that he was going to buy a television for $50 and that he needed $25 to purchase it. Rogers gave him $30. Washington heard Mitchell ask Rogers for the money and saw Rogers hand Mitchell some money. Mitchell told Rogers he was leaving Sunny's with "Darryl." When Mitchell left he took only the keys to Rogers' car, and said he would be gone for a few minutes.

Washington had been using Mitchell's cell phone that evening to make calls. She placed a call at approximately 6:10 p.m., and immediately thereafter, she saw Mitchell leaving Sunny's. As he was leaving, Mitchell told her to keep his phone until he returned. Washington saw Colbert and Mitchell leave Sunny's at the same time. Mitchell never returned.

Kevin Bollinger and his mother, Lisa Bollinger, were at their home on the 2800 block of Columbus Avenue in Minneapolis that evening. At about 6:15 p.m., while watching television, they heard seven or more gunshots. When they looked out the window, they saw two cars parked trunk-to-trunk on the east side of Columbus Avenue, just to the north of their building. One car was silver or gray and the other was white. The front of the silver car was pointing south and the front of the white car was pointing north. Both cars had their trunks open. Kevin Bollinger saw a man standing next to the white car fire one gunshot towards the south in the di-

rection of the silver car and get into the white car. Lisa Bollinger saw only the back of an African–American male getting into a white car. The man was wearing a dark, brimmed dress hat, with a long, dark or black trench coat that was tied at the waist. The shooter drove away in what looked like a white, four-door Cadillac. Lisa Bollinger thought the car was older, while Kevin Bollinger thought the car might have been newer. The car headed north and turned east on 28th Street. Lisa Bollinger called 911 at 6:17 p.m.

Another eyewitness, Kiersten Chace, parked her car on Columbus Avenue shortly after 6:00 p.m. She heard what she described as two African–American men talking in a normal tone of voice, standing on the east side of Columbus Avenue behind a car with the trunk open. One of the men pulled out a gun and began shooting the other man. The shooter wore a long coat that "came below the buttocks." Chace heard what she thought were six to eight gunshots. The next thing she saw was a large, white sedan speeding away. The car looked like a Monte Carlo and had a "boxed-shaped" trunk. She called 911 at 6:20 p.m. In all, five 911 calls were made regarding the shooting.

When police officers arrived at the scene of the shooting, they found a gray Buick Regal, which was later determined to be Rogers', facing southbound on the east side of Columbus Avenue with its trunk open and motor running. Mitchell's body was lying dead in the street with multiple gunshot wounds. The police found eight discharged shell casings at the scene. There were no fingerprints found on the casings. While at the scene, the police interviewed both of the Bollingers and Chace, and documented their accounts of the shooting.

The next day, at about 9:40 p.m., police responded to a shots-fired call at an apart-

ment on 19th Avenue in Minneapolis. This apartment belonged to Colbert's nephew, Mark Colbert (M. Colbert). Police officers found a black and silver Lorcin nine millimeter semi-automatic handgun in the apartment. They also determined that both Colbert and a man named Troy Parker had been shot. Forensic experts subsequently determined that at least three of the bullets that killed Mitchell were fired from the nine millimeter gun found in the apartment.

According to Parker, M. Colbert had asked Parker to watch M. Colbert's apartment while he, M. Colbert, was out of town. On December 27, Parker received a call from Guy Richardson, M. Colbert's neighbor. Colbert, who was with Richardson at the apartment building, took the phone and told Parker that the neighbors were complaining that the television in M. Colbert's apartment was too loud.

In response to the call, Parker went to the apartment around 7:00 p.m., parked in the rear of the building, and entered M. Colbert's empty apartment through the back door. Colbert was outside the front door of the apartment and Parker let him in. Colbert's speech was slurred and Parker thought he had been drinking.

Parker eventually told Colbert that he, Parker, had to leave. According to Parker, Colbert then stood up and walked around a table, pulled out a gun, and shot Parker in the back of the leg. Parker grabbed the gun and the two struggled. During the struggle, Colbert was shot. At some point, Parker was able to get the gun away from Colbert, and when he did so he fired a shot towards Colbert. Colbert fled the apartment. Parker testified that he saw Colbert get into a white, older model vehicle, either a Dynasty or a New Yorker.

Parker's account was corroborated by Richardson, who claimed that he was in his apartment alone around 8:30 or 9:00 p.m. on December 27, when Colbert came to his apartment.[1] Colbert had been "banging" on M. Colbert's door for a while and came to Richardson's apartment to ask if Richardson had seen Parker. Richardson said Colbert was "kind of slurring his words," and "[i]t seemed like he had been drinking." Colbert used Richardson's phone to call Parker. Richardson overheard part of Colbert's conversation, and thought that Colbert was "trying to get somebody to come over there." Colbert "kept saying the TV was too loud and that the neighbors were complaining."

After the phone call, Colbert told Richardson that "he had something for [Parker]." Then Colbert "walked over by the door and * * * put his hands behind his back and it sounded like a gun cocking and he said, 'Mind your business about what you hear over here or I'm going to come back.'" A few minutes later, Richardson heard Parker's voice. Then he heard three gun shots and called 911.

As part of their investigation of the December 27 shooting, the police took Colbert's white 1988 Chrysler New Yorker to the police forensic garage. An officer investigating the Mitchell murder saw the car there, thought that it looked similar to the car described as being involved in Mitchell's murder, and took a picture to show witnesses.

As part of the investigation of the Mitchell murder, the police obtained surveillance videotapes from Sunny's for the night of December 26. The videotapes showed Mitchell leaving Sunny's at 6:13 p.m. on December 26 with an individual in a brimmed, fedora-style hat and a long overcoat. The videotapes also showed the two walking side by side down the sidewalk outside of Sunny's. A still-frame of the

1. The timing discrepancy between Parker and Richardson's testimony was not explained.

videotape showing Colbert entering Sunny's was shown to Kevin Bollinger, who indicated that the clothing worn by Colbert was similar to the clothing worn by the man he saw shoot Mitchell. The police executed a search warrant at Colbert's apartment in St. Paul, where they seized a dark brown, brimmed hat and a tan coat similar in style to that described by eyewitnesses.

The surveillance tapes also showed a white vehicle, similar to the description of the shooter's vehicle and similar to Colbert's New Yorker, drive by Sunny's at 6:21 p.m. Police officers determined that it would take 50–53 seconds to drive from Sunny's to the murder scene.

At trial, in addition to the facts described above, the state sought to demonstrate links between the coat and hat Colbert wore the night of the murder, the coat and hat worn by the shooter, and the hat seized from Colbert's apartment. To do so, the state introduced the testimony of a forensic video analyst who had analyzed Sunny's surveillance tapes. The analyst concluded that there were eight similarities and no dissimilarities between the hat in Sunny's surveillance videotapes and the hat seized from Colbert's apartment. He also concluded that there were a number of style similarities between the coat seen in Sunny's videotapes and the coat seized from Colbert's apartment, however, "there [was] a great difference in tone quality between these two topcoats." Therefore, the analyst concluded that the two were not the same coat. At Colbert's first trial, the state argued that it was not known whether the two coats were the same, and our review of the record from the first trial indicates that the forensic analyst did not testify one way or the other as to whether the two coats were the same. Finally, the analyst testified that there were no dissimilarities between the car seen on the tapes and Colbert's New Yorker. Kevin and

Lisa Bollinger testified that Colbert's car appeared to be similar to the car that they saw on December 26, and that the hat and coat Colbert wore in the surveillance video were similar to the hat and coat worn by the shooter. Chace also testified that Colbert's car was similar in age, color, and shape of the trunk to the car she saw the shooter drive away in.

Colbert testified in his own defense and denied killing Mitchell. Colbert admitted that he went to Sunny's on December 26 and that he arrived there at 5:33 p.m., wearing a long coat and brimmed hat. He claimed that he parked in the Kentucky Fried Chicken parking lot approximately one-half block north of Sunny's. Colbert testified that while he was at Sunny's, he talked to Mitchell for approximately 30 seconds. Colbert further testified that he left Sunny's alone, that Mitchell exited behind him, and that they went their separate ways. Colbert acknowledged that his 1988 Chrysler New Yorker was the car shown on the surveillance videotape driving past Sunny's at 6:21 p.m.

According to Colbert, after he left Sunny's, he went home, then to Chi–Chi's in Richfield, where he ran into a female friend. Colbert and his female friend ultimately went to the Excel Inn in St. Paul, where they had sexual relations. Colbert's friend confirmed that she was with Colbert at Chi–Chi's and accompanied him to the hotel. Colbert's ex-wife testified that she called Colbert on his cell phone at 8:00 p.m. on December 26 and she thought he was at home. Later that evening, between 10:30 and 11:30, she saw Colbert with a woman at Chi–Chi's. The prosecution used this information during closing argument to imply that Colbert's female friend was biased and that Colbert's fiancé, who also testified in his defense, did not have knowledge of Colbert's whereabouts.

Colbert also testified regarding the December 27 shooting. According to Colbert, on December 27, Parker wanted Colbert to come over to M. Colbert's apartment and "cook up some crack for him." Colbert went to M. Colbert's apartment and knocked on the apartment door, but there was no answer, so he went to Richardson's door and asked if he could use the phone to call Parker. When Colbert spoke with Parker, Parker said he was on his way to the apartment. Colbert waited outside the apartment for about 20 minutes, and then Parker motioned for him to come into the apartment.

Colbert testified that Parker pulled out a digital scale and put it on the table. Colbert could see Parker had a gun. Parker accused Colbert of stealing his drugs and pointed the gun at Colbert. The gun went off, hitting Colbert's right leg. Then Parker aimed and shot Colbert's left leg. Colbert grabbed for the gun and he and Parker wrestled for control of the weapon. The gun went off and presumably shot Parker. Colbert stumbled out of the apartment to his car and immediately went to the hospital.

On cross-examination, Colbert was asked about a statement he made to the police on December 31, 2003, during the investigation of the December 27 shooting, that he had gone to visit M. Colbert, that M. Colbert's apartment door was unlocked, and that a masked man armed with an automatic weapon pulled him into the apartment. He told police there was a "takeover demand," at which point he began to wrestle with the masked man. Colbert did not tell police about any alleged "crack deal" with Parker. On further cross-examination, Colbert claimed that the December 31 statement was a lie.

Howard Wilder testified that he was with Colbert on December 27 when the second shooting occurred. According to Wilder, he and Colbert drove up to an apartment building and Colbert got out of the car, saying he would be back shortly. After about 20 minutes, Colbert stumbled out of the apartment building and said, "He shot me." Wilder drove Colbert to the hospital in Colbert's car.

## I.

■ Colbert argues that the evidence adduced at trial was insufficient to convict him of first-degree murder. As support for this argument, Colbert cites inconsistent witness descriptions of the car driven by the shooter and the overcoat worn by the shooter, the implausibility of Parker's story regarding the December 27 shooting, and the narrow time-frame between the time Colbert was taped leaving Sunny's and when he was taped driving by Sunny's. He further argues that even "if the evidence is found to be technically sufficient * * * careful consideration of the evidence leaves too many unanswered questions."

In *State v. Mems*, we said:

Assessing the credibility of a witness and the weight to be given a witness's testimony is exclusively the province of the jury. The jury is free to accept part and reject part of a witness's testimony. Inconsistencies or conflicts between one witness and another do not necessarily constitute false testimony or serve as a basis for reversal. "It will be noted that in reviewing the sufficiency of the evidence we do not try the facts anew. Our responsibility extends no further than to make a painstaking review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt is sufficient to permit the jury to reach that conclusion."

708 N.W.2d 526, 531–32 (Minn.2006) (internal citations omitted).

■ This case involves circumstantial evidence. A conviction based on circumstantial evidence is entitled to the same weight as direct evidence. *State v. Olhausen,* 681 N.W.2d 21, 26 (Minn.2004). However, a conviction based on circumstantial evidence will stand only if the circumstantial evidence forms "a complete chain which, in light of the evidence as a whole, leads so directly to the guilt of the accused as to exclude, beyond a reasonable doubt, any reasonable inference other than that of guilt." *State v. Leake,* 699 N.W.2d 312, 319–20 (Minn.2005) (quoting *State v. Wahlberg,* 296 N.W.2d 408, 411 (Minn.1980)).

Viewing the evidence as a whole in the light most favorable to the jury's verdict, we conclude that the evidence leads so directly to Colbert's guilt as to exclude, beyond a reasonable doubt, any reasonable inference other than guilt. Colbert was seen arriving at Sunny's on December 26, 2003, at 5:33 p.m. wearing a brimmed, fedora-style hat and a long topcoat. A Sunny's surveillance videotape from that evening shows Colbert talking to Mitchell at 5:50 p.m. Washington testified that she heard a part of the conversation between Colbert and Mitchell in which $50 was mentioned. Washington also saw Colbert leaving Sunny's with Mitchell, and a videotape from Sunny's surveillance system shows Mitchell and Colbert exiting Sunny's side-by-side at 6:13 p.m. Rogers testified that Mitchell was going to buy a television for $50 and was leaving with someone named Darryl.

Shortly after Colbert and Mitchell left Sunny's, three individuals witnessed two cars parked trunk-to-trunk approximately one and one-half blocks away from Sunny's on the 2800 block of Columbus Avenue. One of the cars was described as an older model white car with a "boxed-shaped" or "squared-off" back end. Two men were standing near the cars. The witnesses saw one of the men, who was wearing a dark, brimmed hat and a long, dark topcoat, shoot the other man. The shooter drove away in the older model white car. Colbert drives a white, 1988 Chrysler New Yorker, which witnesses testified was similar to the shooter's car. Two of the witnesses called 911 immediately after the shooting. The first call was logged at 6:17 p.m. At 6:21 p.m., a white Chrysler New Yorker was videotaped by Sunny's external video surveillance system driving past Sunny's on Chicago Avenue. Colbert admitted that the white Chrysler New Yorker seen driving past Sunny's belonged to him and that he was driving it.

The next day, a gun, which forensic experts determined was involved in Mitchell's shooting, was used in the shooting involving Colbert and Parker. Parker testified that Colbert brought the gun to M. Colbert's apartment, shot Parker, and during an ensuing struggle for the gun, Colbert himself was shot. While Colbert's version of the events leading to him being shot by Parker had Parker bringing the gun to the apartment and shooting Colbert, the jury was free to, and evidently did, reject Colbert's version of these events.

## II.

Colbert next claims that he was denied a fair trial when the state committed a discovery violation by not timely disclosing a change in the forensic video analyst's opinion about the coat seized in the search of Colbert's apartment. Colbert asserts that the state's failure to timely disclose the change in the video analyst's opinion entitles him to dismissal or a new trial. We disagree.

■ Whether a discovery violation occurred presents a question of law, which we review de novo. *State v. Palubicki,* 700 N.W.2d 476, 489 (Minn.2005). Under Minn. R.Crim. P. 9.01, subd. 1(2), a prose-

cutor is required to disclose "the substance of any oral statements which relate to the case." The prosecutor has a continuing obligation to "promptly notify the other party of the existence of the additional * * * information." Minn. R.Crim. P. 9.03, subd. 2(a). The prosecution must also disclose all exculpatory evidence to the defense. Minn. R.Crim. P. 9.01, subd. 1(6); *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The rules do not require that disclosure take any particular form.

■■■ "[O]nce a discovery violation has occurred, a district court 'is particularly suited to determine the appropriate remedy * * *.'" *State v. Bailey*, 677 N.W.2d 380, 397 (Minn.2004) (quoting *State v. Freeman*, 531 N.W.2d 190, 197–98 (Minn. 1995)). We review a trial court's choice of remedy for an abuse of discretion. *See State v. Gates*, 615 N.W.2d 331, 340 (Minn. 2000). Generally we will not grant a new trial unless the defendant shows that the violation was prejudicial. *Palubicki*, 700 N.W.2d at 489. In other words, "a reviewing court ordinarily should not order a new trial if no reasonable probability exists that the outcome of the trial would have been different if the evidence had been available." *Freeman*, 531 N.W.2d at 198.

At each of Colbert's trials, there was testimony about the relationship between the coat Colbert was seen wearing the night of Mitchell's murder and the coat seized from Colbert's apartment. A printed report of the analyst's findings, dated October 21, 2004, was provided to the defense. That report explained that there were some similarities between the coat Colbert wore on December 26 and the coat subsequently seized from his apartment, but that the coat seized from Colbert's apartment appeared to be a lighter color than the coat Colbert wore on December 26. As noted previously, at Colbert's first trial, the state argued that it was not

known whether the two coats were the same, and the video analyst did not testify definitely one way or the other.

According to the state, on January 25, 2005, while one of its prosecutors was preparing the analyst for testimony the next day in Colbert's second trial, the prosecutor asked the analyst "whether he could exclude the coat seized from [Colbert's apartment] as the coat observed on the December [26] surveillance video." The analyst definitively stated that the two coats were not the same. At 7:01 p.m. that evening, the prosecutor sent an email to Colbert's attorney informing him that the analyst had expressly stated that the two coats were not the same. The analyst testified to that effect on January 27, 2005. The state claims that before the analyst testified on January 27, the prosecutor had a conversation with Colbert's attorney in which Colbert's attorney "said something to [the prosecutor] about he's going to say it's not the coat, or something like that, which led [the prosecutor] to believe that [Colbert's attorney] had that e-mail and had the information" that the prosecution had emailed to him on January 25.

On January 28, Colbert's defense counsel moved for dismissal "in the interests of justice" because he had not seen the email regarding the coat until after the analyst testified on January 27 and because the analyst's "new opinion" constituted a change in the prosecution's theory of the case, amounting to a discovery violation. Defense counsel also requested that he be given certain Polaroid pictures of the coat seized from Colbert's apartment, which Sergeant Erika Christensen, who had already testified, showed to witnesses during the investigation of Mitchell's death. Defense counsel argued that, had he known about the analyst's "new opinion," he "would have been able to cross-examine Sergeant Christensen about that change,

that shift, in [the state's] posture of what they believed the facts in this case were." The trial court ordered and the prosecutor provided the Polaroid pictures to Colbert. The trial court also permitted Colbert to re-call Officer Christensen and cross-examine her regarding witness identification of the coat seized from Colbert's apartment. The trial court denied the motion to dismiss.

 We have not had occasion in the past to decide whether a prosecutor's disclosure of a new statement of a witness as required by Rule 9.01, subd. 1(2) and subd. 2(a), is sufficient when the disclosure, as here, was done by email message sent at night during the middle of trial. And we decline to do so here because, even if we were to conclude that the email message here was not sufficient to satisfy Rule 9.01, Colbert would not be entitled to the relief he seeks. While arguing the motion for dismissal, counsel for Colbert specifically stated that, had he known the analyst's "new opinion," he would have cross-examined Sergeant Christensen regarding the Polaroid pictures shown to witnesses. The trial court determined that the appropriate remedy for the alleged violation was to require the state to produce the Polaroid pictures and allow Colbert to cross-examine Officer Christensen. By doing so, the trial court put Colbert in the same position he would have been in if he had known of the video analyst's "new opinion" earlier. Therefore, the trial court did not abuse its discretion when it fashioned the remedy for the alleged discovery violation.

 Moreover, Colbert has failed to show that he was prejudiced by the alleged violation. Although Colbert claims he was prejudiced because the "new opinion" constituted a change in the state's theory of the case, the record belies that assertion. In essence, Colbert's argument, as set forth in his brief and as articulated at oral argument before the court, is that the

state's theory at the first trial was that the two coats were the same. In fact, our reading of the record indicates that, in addition to the analyst's October 2004 report indicating that the coats were dissimilar in color, the state argued at Colbert's first trial that it was not known whether the two coats were the same. Specifically, the state argued:

> Now, the defendant would like you to believe that the coat [found at his apartment], is the same coat that you see in this surveillance video. * * * We don't know if that's the same coat. * * * It's the same style, and that's significant. It's a long dress coat. This is the kind of coat that the defendant likes to wear.

Interestingly, it appears that the excerpts of the state's closing argument from Colbert's first trial that Colbert uses to support his argument actually reference the state's argument that the coat Colbert wore on December 26 was the same coat witnesses saw the shooter wearing when he shot Mitchell.

The analyst's testimony at the second trial that the two coats were definitively not the same coat was simply an extension of the theory the state had maintained throughout both trials—that although the coat seized from Colbert's apartment was likely not the coat he wore on December 26, it was similar in style and represented a type of coat Colbert "likes to wear." Thus, we conclude that the state did not change its theory of the case between the two trials as it related to the coat worn by Colbert on the night Mitchell was murdered and the coat seized from Colbert's apartment, and therefore Colbert was not prejudiced by any alleged discovery violation.

### III.

 Finally, Colbert claims that the prosecuting attorney engaged in mis-

conduct by (1) improper reference to Colbert's exercise of the Sixth Amendment right to be present at trial and (2) improper reference to Colbert's sexual infidelity. During Colbert's cross-examination, the prosecutor pointed out that Colbert had "sat through the entire trial," had the opportunity to hear the testimony of a number of witnesses, and had been provided with police reports, surveillance videos, photos, and transcripts from other proceedings. Colbert made no objection to any of the cross-examination he now claims implicated his Sixth Amendment right to be present at trial. Therefore, our review is for plain error. *See State v. MacLennan*, 702 N.W.2d 219, 235 (Minn. 2005). When assessing whether plain error occurred, we ask "whether (1) there was error, (2) the error was plain, and (3) the error affected the defendant's substantial rights." *Id.* "Error is prejudicial if there is a reasonable likelihood that the absence of the misconduct in question 'would have had a significant effect on the verdict of the jury.'" *Id.* at 236 (quoting *State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998)). If all three requirements are met, we assess whether we "should address the error to ensure fairness and the integrity of the judicial proceedings." *Griller*, 583 N.W.2d at 740. We are satisfied, on the record presented and given the limited nature of the cross-examination that might have violated Colbert's rights under the Sixth Amendment, that any possible misconduct did not affect Colbert's substantial rights.

We need not analyze Colbert's remaining claims of prosecutorial misconduct in detail. It is enough to say that we have carefully reviewed the record as it relates to those claims and conclude that if any of the conduct underlying the claims constituted prosecutorial misconduct, none of the conduct as alleged, whether viewed as discrete instances of misconduct or collectively, was so serious or prejudicial as to deny Colbert a fair trial.

Affirmed.