*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1782**

State of Minnesota,
Appellant,

vs.

Coleen Joy Peterson,
Respondent.

**Filed May 16, 2016**
**Reversed and remanded**
**Larkin, Judge**
**Concurring specially, Rodenberg, Judge**

Clearwater County District Court
File No. 15-CR-14-379

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Richard C. Mollin, Clearwater County Attorney, Jason P. Steck, Assistant County Attorney, Bagley, Minnesota (for appellant)

Mark D. Nyvold, Fridley, Minnesota (for respondent)

        Considered and decided by Hooten, Presiding Judge; Larkin, Judge; and Rodenberg, Judge.

**LARKIN**, Judge

In this pretrial appeal, the state challenges the district court's exclusion of a confidential reliable informant's testimony as a sanction for discovery violations. Because the sanction is based on the erroneous conclusion that the state failed to preserve evidence and inappropriate consideration of the prosecution's alleged discovery violations in unrelated cases, we reverse and remand.

## FACTS

In September 2014, appellant State of Minnesota charged respondent Coleen Joy Peterson with fourth-degree controlled-substance crime after she sold methamphetamine to a confidential reliable informant (CRI) during a controlled buy. Peterson made a discovery request seeking information regarding the identity of the CRI, the CRI's communications with law enforcement, and any agreements between the CRI and law enforcement regarding promises or consideration for the CRI's participation in the controlled buys.

Over the course of approximately six months, the discovery process revealed the CRI's identity, as well as the following information.[1] The CRI had previously cooperated with the Paul Bunyan Drug Task Force (task force). Prior to the controlled buys in this case, the CRI was arrested and charged with second-degree driving while impaired (DWI), while on felony-level probation. While the CRI was in jail following the DWI arrest, she

---

[1] Although the CRI's identity is now known, this opinion continues to use the term "CRI" for consistency.

asked to speak with a narcotics agent. Officer Ryan Solee met with the CRI in jail, and the CRI offered to cooperate with the task force in exchange for leniency in her pending criminal cases. On March 4, 2014, the CRI's probation officer authored a report recommending that the CRI's probation be revoked and her sentence be executed if she were to be convicted of the new DWI offense. On March 12, the CRI pleaded guilty to the DWI charge, and, pursuant to the joint recommendation of the parties, the district court deferred disposition and released the CRI from custody. On March 17, the CRI met with Officer Solee and Officer Ryan Pierre. In his report regarding that meeting, Officer Solee wrote that "[the CRI] advised that she wanted to become a confidential informant for the Paul Bunyan Drug Task Force again." On March 20, the CRI made two controlled buys from Peterson.[2] On April 9, the CRI appeared for a hearing on her pending criminal cases. The state recommended a probationary disposition on the new DWI conviction and reinstatement of the CRI's felony-level probation with no additional consequences. The district court followed the state's recommendation.

Peterson demanded that the state disclose the terms of any agreement between the CRI and the state regarding consideration for her participation in the controlled buys from Peterson. The prosecutor originally informed defense counsel that he thought there was an express agreement between the CRI and law enforcement regarding consideration for her

_____

[2] The record indicates that the CRI made a controlled buy of the prescription drug Clonazepam from Peterson on March 20. During the course of that transaction, Peterson indicated she had methamphetamine. The task force arranged for the CRI to purchase methamphetamine from Peterson the same day.

3

participation.[3]  Later, the prosecutor indicated that he was mistaken and insisted that there was not a record of any express agreement for consideration between law enforcement and the CRI or between the prosecution and the CRI.  The prosecutor submitted a letter from Officer Solee, summarizing the substance of his oral communications with the CRI as follows:

> [T]he initial contact was made by [the CRI].  She was in custody at the Clearwater County Jail for a D.W.I. offense and had requested to speak with a narcotics agent.  She was looking for sentencing consideration for her offense, and for the probation violation that would follow.

Peterson's investigator interviewed Officer Solee about the CRI's controlled buys.  Peterson disclosed the investigator's notes from the interview, which indicate that "[t]he CRI had been incarcerated on separate charges and was seeking sentencing consideration," the "CRI identified Coleen Peterson early on as someone the CRI knew was involved in narcotics," Officer Solee "told [the] CRI if the opportunity presented itself to give him a call," Officer Solee believed that the CRI either called him or texted him that day and told him "'[h]ey, it's on,'" and he remembered the events "unfolding rather quickly that day."

On July 14, 2015, Peterson moved the district court to sanction the state for discovery violations.  Specifically, Peterson asked the district court to exclude the CRI's testimony at trial, arguing that the state failed to provide "critical and necessary evidence relating to the credibility of [the CRI]" by failing to disclose information "confirming whether [the CRI] received any consideration in exchange for her work for law

---

[3] We note that the state's attorney of record in this appeal was not the prosecutor in district court.

4

enforcement." The district court granted the request for sanctions, ruling that the CRI's testimony would not be allowed at trial.

## DECISION

### I.

The state may appeal from "any pretrial order" so long as "the district court's alleged error, unless reversed, will have a critical impact on the outcome of the trial." Minn. R. Crim. P. 28.04, subds. 1(1), 2(1). "[A] pretrial order will only be reversed if the state demonstrates clearly and unequivocally that the [district] court has erred in its judgment and that, unless reversed, the error will have a critical impact on the outcome of the trial." *State v. Underdahl*, 767 N.W.2d 677, 681 (Minn. 2009) (quotation omitted). "The critical impact requirement has evolved into a threshold issue, so that in the absence of critical impact we will not review a pretrial order." *Id.* (quotations omitted).

Peterson concedes that the district court's exclusion of the CRI's testimony satisfies the critical-impact standard. Because it appears that the CRI is the only eyewitness to the charged offense, we agree that the exclusion of the CRI's testimony would have a critical impact on the outcome of the trial. The district court's pretrial discovery sanction is therefore reviewable on appeal.

### II.

"The imposition of sanctions for violations of discovery rules and orders is a matter particularly suited to the judgment and discretion of the [district] court. Accordingly, [appellate courts] will not overturn its ruling absent a clear abuse of discretion." *State v. Patterson*, 587 N.W.2d 45, 50 (Minn. 1998) (quotation omitted). However, "[p]reclusion

5

of evidence is a severe sanction which should not be lightly invoked." *State v. Lindsey*, 284 N.W.2d 368, 374 (Minn. 1979). The district court abuses its discretion if it misinterprets or misapplies the law. *Johnson v. State*, 733 N.W.2d 834, 836 (Minn. App. 2007), *review denied* (Minn. Sept. 18, 2007).

The district court's discovery sanction is based on its conclusions that the state failed to preserve evidence regarding whether the CRI was promised or given consideration for her cooperation, failed to make a reasonable and diligent effort to respond to discovery requests, and failed to respond to some discovery requests. The district court also concluded that these discovery violations caused defense counsel to expend unnecessary time obtaining discovery. We address the alleged discovery violations in turn.

*Failure to Preserve Evidence*

The first basis for the district court's discovery sanction is its conclusion that "[t]he state failed to preserve evidence regarding whether [the CRI] was promised or given consideration for her cooperation." A defendant's due-process right to a fair trial is violated by the state's destruction of potentially useful evidence when the defendant can show that the state destroyed the evidence in bad faith. *See State v. Hawkinson*, 829 N.W.2d 367, 369 (Minn. 2013). This rule stems from the United States Supreme Court's holdings in *California v. Trombetta* and *Arizona v. Youngblood*. *See id.* at 371-72 (discussing *California v. Trombetta*, 467 U.S. 479, 104 S. Ct. 2528 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988)).

In *Trombetta*, the United States Supreme Court considered, for the first time, "the government's duty to take affirmative steps to preserve evidence on behalf of criminal

6

defendants" and held that the state's constitutional duty to preserve evidence is "limited to evidence that might be expected to play a significant role in the suspect's defense." 467 U.S. at 486, 488, 104 S. Ct. at 2533, 2534. Later, in *Youngblood*, the United States Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58, 109 S. Ct. at 337. The Court noted its "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* (citation omitted).

The failure-to-preserve-evidence caselaw generally involves situations in which physical evidence was lost or destroyed. *See, e.g.*, *Youngblood*, 488 U.S. at 52, 109 S. Ct. at 334 (semen samples); *Trombetta*, 467 U.S. at 481, 104 S. Ct. at 2530 (breath samples); *State v. Jenkins*, 782 N.W.2d 211, 235-36 (Minn. 2010) (GPS data from taxicab, wallet, pair of shoes, car, pants, blood evidence on gun, biological material on bullets and bullet fragments); *State v. McDonough*, 631 N.W.2d 373, 387 (Minn. 2001) (car, information recorded in caller ID box). But this is not a case in which the state failed to preserve physical evidence such as written notes regarding communications with a CRI or a recording of those communications.[4] This case involves the state's failure to create physical evidence documenting oral communications.

---

[4] Such circumstances could give rise to a failure-to-preserve-evidence claim. *See Killian v. United States*, 368 U.S. 231, 236-44, 82 S. Ct. 302, 305-10 (1961) (discussing without

7

Nonetheless, the district court concluded that the state failed to preserve evidence, reasoning that:

> Regarding the matter of consideration, the state did not preserve the communications between Solee and [the CRI] during their first meeting when they discussed her possible cooperation with the state. Accordingly, it is not known whether at that time any promises or inducements were made to [the CRI]. The existence and details of these communications are important as they bear upon the motives of the witness and constitute the foundation of crucial impeachment evidence.

The district court equated preservation with physical documentation, explaining that:

> The state has offered no reason or excuse why the initial communications between Solee and [the CRI] were not preserved. The meeting took place in the Clearwater County jail so there is no logistical reason why the conversation was not recorded or why Solee did not make some notes or thereafter write a report to preserve the communication.

We are not aware of any authority supporting the proposition that the state must preserve the substance of oral communications between law-enforcement officers and informants in a physical format. Minn. R. Crim. P. 9.01, which governs the prosecutor's disclosure obligations in a criminal case, does not impose such a requirement. *See* Minn. R. Crim. P. 9.01. Instead, the rule recognizes that oral statements are not always recorded or reduced to writing by providing that the prosecutor must disclose "the substance of oral

---

deciding defendant's claim that destruction of witness-interview notes constituted a due-process violation). *But see United States v. Hoppe*, 645 F.2d 630, 634 (8th Cir. 1981) (holding that state's destruction of notes regarding conversations with informant was not a due-process violation).

statements" that relate to the case.[5]  Minn. R. Crim. P. 9.01, subd. 1 (2)(c).  Moreover, Peterson does not assert that the state was required to record the communications between the law-enforcement officers and the CRI.  Instead, Peterson argues that "even if no rule, statute, or case requires [the state to record communications between an informant and the state], the fallibility of human memory makes it at the very least a good idea for the state to at least briefly memorialize cooperation agreements."

The lack of an obligation to preserve the substance of the oral communications between law-enforcement officers and informants in a physical format is important to our analysis because a failure-to-preserve-evidence claim necessarily fails when the state was not obligated to collect the evidence in the first place.  *Jenkins*, 782 N.W.2d at 235.  In *Jenkins*, the defendant claimed that he was "entitled to an acquittal because the State destroyed material evidence, thus denying him a fair trial."  *Id.*  The supreme court noted that "[t]he duty to preserve evidence only applies to evidence that is actually collected during the investigation of the crime because it would be illogical to require the State to preserve evidence it does not possess."  *Id.* (quotation omitted).  One of Jenkins's arguments was that the "police failed to collect GPS data from the taxicab that allegedly transported [him] after the murders, failed to collect a wallet at the crime scene, failed to

---

[5] We recognize that "[a] prosecutor cannot circumvent the requirement of open-file discovery by not taking notes or by not putting things in the file that belong in the file." *State v. Kaiser*, 486 N.W.2d 384, 387 (Minn. 1992).  But "[t]he rules do not require that disclosure take any particular form." *State v. Colbert*, 716 N.W.2d 647, 655 (Minn. 2006). Here, the record does not indicate the prosecution withheld evidence or attempted to subvert rule 9.01 by not preserving the substance of the communications between law-enforcement officers and the CRI in a physical format.

collect a pair of shoes visible in the police photos of the crime scene, and 'did nothing to trap any civilian shoes or impressions' from the crime scene." *Id.* The supreme court concluded that "[b]ecause the police had no obligation to collect any of this evidence, these claims necessarily fail." *Id.*

Like the circumstances in *Jenkins*, the state was not obligated to collect the evidence at issue in this case. That is, the state was not required to memorialize the substance of the communications between Officer Solee and the CRI in a physical format. Thus, any failure-to-preserve-evidence claim based on the lack of memorialization necessarily fails. *See id.*

In conclusion, this is not a case in which the state lost, destroyed, or otherwise failed to preserve physical evidence that it had collected. Instead, it is a case in which the state failed to document the substance of oral communications with an informant in a physical format, which it was not required to do. Under these circumstances, the state did not fail to preserve evidence in violation of the constitution.

*Other Discovery Violations*

The district court also concluded that "[t]he state failed to make a reasonable and diligent effort to respond to legally proper discovery requests of the defense," "[t]he state failed to respond to some discovery requests" and that "[t]he state's discovery violations caused defense counsel to expend unnecessary time in an effort to obtain disclosure." The district court noted that "[t]he state delayed and obstructed disclosure of . . . impeachment evidence," referring to the substance of the oral communications between law enforcement

and the CRI. The district court provided several specific examples of the state's "delayed and incomplete disclosure[s]," which are not repeated here.

The record sustains the district court's conclusions regarding the state's delayed and incomplete disclosures. For example, the district court noted that in a response to a discovery request asking whether the CRI had worked with law enforcement in the past, the state responded "None," even though the CRI had previously worked with the task force. Similarly, in response to a discovery request asking whether the CRI abused controlled substances, the state answered "None Known," despite the CRI's documented history of chemical abuse, which was detailed in the state's own files. Moreover, the state did not disclose a March 2014 task force report regarding the CRI's work for the task force until March 2015, even though law enforcement apparently had possession of it earlier and Peterson had specifically requested information pertaining to the CRI's activities with the task force. The effect of these delayed and incomplete disclosures was compounded by the state's inconsistent statements regarding whether the state promised the CRI specific consideration in exchange for her cooperation.

In addition to relying on the state's delayed and incomplete disclosures, the district court opined that the prosecution had "an ongoing pattern of disregard of . . . disclosure obligations under the law," noting that the "pattern of discovery violations" was "[p]erhaps the most disturbing aspect of the prosecutor's actions." The district court described the prosecution's alleged discovery violations in two unrelated cases involving other

11

defendants.[6]  The state contends that the district court erred by basing the sanction in this case on unrelated cases.  For the reasons that follow, we agree.

Rule 9.03 provides for the regulation of discovery.  Minn. R. Crim. P. 9.03.  It provides that "[a]ll material and information to which a party is entitled must be disclosed in time to afford counsel the opportunity to make beneficial use of it."  *Id.*, subd. 2(a).  The rule also mandates "a continuing duty of disclosure before . . . trial."  *Id.*, subd. 2(c).  The rule authorizes sanctions, providing that "[i]f a party fails to comply with a discovery rule or order, the court may, on notice and motion, order the party to permit the discovery, grant a continuance, or enter any order it deems just in the circumstances."  *Id.*, subd. 8.

We are not aware of any authority that allows a district court to impose a rule 9 discovery sanction based on the prosecution's actions in an unrelated case.  Indeed, the plain language of rule 9 indicates that it governs discovery obligations in a particular case.  *See* Minn. R. Crim. P. 9.01, subd. 1 (requiring the prosecution to disclose matters, persons with information, documents and objects, and reports of examinations and tests that "relate to *the* case," as well as exculpatory information that "tends to negate or reduce *the* defendant's guilt" (emphasis added)); *State v. Hohenwald*, 815 N.W.2d 823, 830 (Minn. 2012) ("The definite article 'the' is a word of limitation that indicates a reference to a specific object.").  Because the prosecution's disclosure obligations under rule 9 are case specific, any sanction based on failure to comply with those obligations is necessarily case

---

[6] This opinion does not discuss the other cases on which the district court relied or draw any conclusions regarding the prosecution's alleged actions in those cases, which are not before us on appeal.

specific.  Otherwise, a district court could exclude evidence in one case based on a discovery violation in an unrelated case that could not possibly have prejudiced the defendant in the sanctioned case. *See Lindsey*, 284 N.W.2d at 369 (stating that the district court should consider the extent of prejudice resulting from a discovery violation when imposing a sanction).  In sum, the prosecution's alleged pattern of discovery violations in other cases is not a basis for the discovery sanction in this case.

Peterson argues that we should ignore the district court's reliance on the state's purported failure to preserve evidence and the prosecution's alleged discovery violations in unrelated cases.  Essentially, Peterson argues that we should look beyond the district court's thorough memorandum explaining its order and conclude that the district court actually based the sanction on the prosecution's discovery violations in this case, including the failure to disclose the terms of an express agreement in which the state promised to provide consideration in exchange for the CRI's participation in the controlled buys from Peterson.  Alternatively, Peterson argues that we should adopt that reasoning and hold that the district court reached the right result based on the wrong reason. *See Kahn v. State*, 289 N.W.2d 737, 745 (Minn. 1980) (noting that the supreme court will not "reverse on appeal a correct decision simply because it is based on incorrect reasons"); *see also State v. Fellegy*, 819 N.W.2d 700, 707 (Minn. App. 2012) ("We may affirm the district court on any ground, including one not relied on by the district court."), *review denied* (Minn. Oct. 16, 2012).

We decline to do so because a conclusion that the state failed to disclose the terms of an express agreement between the police and the CRI is inconsistent with the district

13

court's finding that "there is no direct evidence of [such] an express agreement." Moreover, although we agree with the district court's finding that "there is strong evidence of an implied agreement," that finding is based on disclosures that *were* made. In sum, neither the district court's order nor the record supports a sanction based on nondisclosure. The only sanctionable conduct is the prosecution's delayed and incomplete disclosures.

Peterson also argues that the state used its policy of not documenting deals with informants to advance its "plausible deniability scheme," allowing it to make deals with informants without having to disclose them to the defense, and to thereby prevent the defense from introducing the terms of the deals as impeachment evidence. Peterson contends that the district court has discretion to sanction the state for this conduct under rule 9. Essentially, Peterson would have us hold that the state must document the occurrence and substance of every oral conversation in which a law-enforcement officer and an informant discuss the informant's potential participation in a hypothetical controlled buy because the conversation might become exculpatory evidence if the informant makes a controlled buy and the seller is prosecuted.

We are not aware of any authority imposing such a requirement. Moreover, it is inconsistent with United States Supreme Court precedent. *See Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337 (stating that "the Due Process Clause [does not impose] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance"). The holding that Peterson seeks may be within the Minnesota Supreme Court's supervisory powers, but as an error-correcting court, we decline to adopt the rule that Peterson suggests in the absence of supporting authority. *See*

14

*State v. Scales*, 518 N.W.2d 587, 592-93 (Minn. 1994) (adopting a recording requirement in the exercise of the supreme court's "supervisory power to insure the fair administration of justice").

*Discovery Sanction*

Having concluded that neither the purported failure to preserve evidence in this case, nor the prosecution's alleged pattern of discovery violations in other cases, provides justification for the sanction here, we turn to the only remaining ground for the exclusion of the CRI's testimony: the state's delayed and incomplete disclosures. Once again, "[t]he imposition of sanctions for violations of discovery rules is a matter for the sound judgment and discretion of the trial court." *Lindsey*, 284 N.W.2d at 369. When exercising this discretion, the district court should consider the following factors from *State v. Lindsey*: the reason why disclosure was not made, the extent of prejudice to the opposing party, the feasibility of rectifying that prejudice with a continuance, and any other relevant factors. *Id.* "Preclusion of evidence is a severe sanction which should not be lightly invoked." *Id.* at 374.

Although the district court analyzed the *Lindsey* factors, its analysis focused on the state's failure to preserve the initial communications between Officer Solee and the CRI, which was not a discovery violation. The district court reasoned that "[t]he state has offered no reason or excuse why the initial communications between Solee and [the CRI] were not preserved" and that "[a]s the evidence was not preserved and is lost, a continuance would not rectify the prejudice." The district court did not separately analyze whether the prosecution's delayed and incomplete disclosures alone justify exclusion of the CRI's

15

testimony under the *Lindsey* factors. Instead, the district court considered the delayed and incomplete disclosures, as "[o]ther relevant factors" in its *Lindsey* analysis.

Ultimately, the district court reasoned that the exclusion remedy "is arguably too harsh as it relates to the 'failure to preserve evidence' violation," because "[t]his is not a situation where the defense is without any impeachment evidence due to a discovery violation." The district court noted that if the CRI is allowed to testify, "the defense may well be able to establish that [the CRI] set up [Peterson] to protect herself and might be able to cast [the CRI] as an unreliable witness." But the district court also reasoned that it was "unable to fashion a less-severe remedy . . . that does not minimize the discovery violations of the state, and when *all of the discovery violations* are considered together the exclusion remedy alone appears too light." (Emphasis added). Although it is apparent that the exclusion sanction is based on "all" of the discovery violations identified by the district court, it is not clear whether the district court would have excluded the CRI's testimony based solely on the state's delayed and incomplete disclosures. That decision is entrusted to the district court's sound discretion.

Because the sanction excluding the CRI's testimony is based on the erroneous conclusion that the state failed to preserve evidence and inappropriate consideration of the prosecution's alleged discovery violations in unrelated cases, we reverse the order excluding the CRI's testimony and remand the case to the district court for further proceedings consistent with this opinion. On remand, the district court may consider what if any sanction is appropriate based solely on the state's delayed and incomplete disclosures.

16

**Reversed and remanded.**

**RODENBERG**, Judge (concurring specially)

This is a very troubling case. As with many drug-sale prosecutions, the state's case understandably depended on a nominally "reliable" informant—a snitch. This particular snitch was arrested in 2014 for a second-degree DWI while on felony probation for a 2010 conviction of third-degree controlled-substance crime (methamphetamine) and child endangerment. When arrested, she tested positive for marijuana, opiates, and methamphetamine. Her experience in avoiding the consequences of her own criminal behavior by cooperating with the police in drug-sale stings[1] led her to call Deputy Solee to "again" do work for the Task Force. They talked. Soon, she was out of jail and cooperating with the Task Force. The earlier recommendation that she go to prison for violating her felony probation was withdrawn, and she was back on the streets with little change in her probationary status.[2]

---

[1] This informant was placed on probation in 2010 for using and allegedly selling methamphetamine in the presence of her young child. She violated her probation just six months later by failing to complete treatment, using methadone and cocaine, and falling out of contact with her supervising agent. She admitted violating probation and was released to return to court for disposition on the probation violation. However, she did not appear for the disposition hearing because she was already in jail in another county. But she did some work for the Task Force and was reinstated to probation in 2011. In 2013, police officers including Deputy Solee found her to be in possession of marijuana, traces of methamphetamine, and hypodermic needles. She admitted recent methamphetamine use, but was only charged with possession of a small amount of marijuana and paraphernalia, and was again reinstated to probation. It is not clear from the record how she was able to obtain this outcome. The DWI offense that resulted in her call to Deputy Solee in this case was on January 23, 2014.

[2] Repeatedly reinstating this profoundly chemically dependent informant to probation (for an underlying methamphetamine conviction) is difficult to reconcile with law enforcement sending her to buy methamphetamine. Although it is beyond the scope of this concurrence, law enforcement enlisting as undercover drug buyers persons who are on probation and in

CS-1

In the memorandum appended to its order, the district court found no "direct evidence of any express agreement" between the state and the informant. The district court noted, however, that there was "strong evidence of an implied agreement." The circumstances surrounding the handling of the informant's new DWI charge, and of the related felony-probation violations, were such that the district court believed there to have been what it characterized as a "surreptitious agreement" between the prosecutor[3] and the informant's lawyer. But the district court did not find as a fact that there was an agreement with the informant. It only noted in its memorandum that "[a]t a minimum there was an implied agreement."

When defense counsel asked about the agreement between the informant and Deputy Solee and/or the prosecutor, the prosecutor first informed defense counsel that the informant was reinstated to probation in exchange for her cooperation with the Task Force.

---

chemical-dependency treatment has been criticized in the context of drug courts. *See, e.g.*, Hennepin Cty. Chem. Dependency Task Force, *Final Recommendations for Adult Drug and DWI Offenses*, 20 http://www.mncourts.gov /mncourtsgov/media/scao_library/Drug%20Courts/4th%20District/DWI%20Court/HC_C D_Task_Force_Report_Adult.pdf (disqualifying police informants from participating in Drug Court); Bureau of Justice Drug Court Clearinghouse, *Frequently Asked Questions Series: Should Informants Participate in Drug Court?*, Am. Univ. Sch. Of Pub. Affairs 2-3 (July 1, 2004), http://jpo.wrlc.org/bitstream/handle/11204/3262/FAQ_Admitting%20 Informants%20to%20a%20Drug%20Court%20Program.pdf?sequence=3 (observing that drug-court participants are given "mixed and confusing messages" when enlisted as informants during a time when they are required to be sober and avoiding association with users, in addition to sometimes being "forced to use drugs to maintain their informant position"). The same concerns are present here. This informant has been allowed to repeatedly avoid or defer both criminal consequences and abstinence. She has continued to drive while impaired. Who will take responsibility if/when she injures or kills someone?

[3] Appellate counsel was not the prosecutor in the district court proceedings.

The prosecutor later confirmed this to the district court on the record, stating that "she got a break from the sentence being executed." But the prosecutor later stated to the district court, and the state maintains on appeal, that there was no agreement with the informant. The district court didn't believe that. Neither do I.

The state's discovery responses were repeatedly incomplete and inaccurate. Despite this informant's steady work with law enforcement to immunize her own criminal conduct from legal consequences, the state initially responded to discovery in January 2015 stating that her history as an informant was "none," and that her chemical use history was "none known." The informant had pleaded guilty to her new DWI and admitted violating her felony probation in March 2014. The disposition of those cases was deferred while she did the work that gave rise to this case.

"A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice." Minn. R. Prof. Conduct 3.8, advisory comm. 1 (2016). A prosecutor is specifically obligated to "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense." Minn. R. Prof. Conduct 3.8(d). And every attorney has the duty of candor to the tribunal before which the attorney appears. Minn. R. Prof. Conduct 3.3. That duty prohibits not only the making of a "knowingly . . . false statement of fact or law," but also prohibits "fail[ing] to correct a false statement of material fact or law previously made to the tribunal." Minn. R. Prof. Conduct 3.3 (a)(1).

I agree with the majority that the case must be remanded because the district court erroneously relied on what has (or has not) happened in files involving other defendants, and it improperly posited the existence of a duty on the part of the state to create discoverable documents concerning the agreement with this informant. These errors require reversal and remand.

On remand, the district court might well conclude that the delayed and incomplete disclosures, standing alone, warrant the sanction of excluding the informant's testimony at trial. Moreover, if the district court finds as a fact that the state had an agreement with this informant, a finding not expressly made thus far, and if it finds that an attorney knowingly made false statements to the district court concerning that agreement, the district court might also consider whether the prosecutor's conduct warrants a report of unprofessional conduct. *See Application of Hanson*, 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960) ("Courts are charged with the duty of controlling the qualification and conduct of attorneys at law in order that there may be no compromise whatever of the moral and ethical standards upon which the functioning of our legal system depends.").